Jones, Chief Judge,
delivered the opinion of the court:
This is an action for breach of contract. Plaintiff sues to recover approximately four and a half million dollars in damages. The facts of this suit relate back to the Second World War when the defendant erected a number of plants devoted to the manufacture of aluminum, from the raw material through to the finished product. These plants were built and operated for the defendant by the Aluminum Company of America (hereinafter called Alcoa). Prior to the war, however, a proceeding was brought against Alcoa by the defendant seeking relief against monopolistic practices charged against Alcoa. See United States v. Aluminum Co. of America, 148 F. 2d 416 (2d Cir. 1945).
After the war, these plants were declared surplus and ready for disposal pursuant to the Surplus Property Act of 1944, 58 Stat. 765. To accomplish defendant’s objective of creating a competitive situation in the aluminum industry, the defendant sought to sell these plants to companies other than Alcoa. However, the defendant desired to sell these *643 plants only to companies with sufficient financial resources and technical competence to assure their success in the operation of these plants. Accordingly, after canvassing other potential purchasers, the defendant decided to dispose of these plants between the Reynolds Metals Company and the Kaiser Aluminum & Chemical Corporation.[1]
In 1945 and 1946, Reynolds Metals Company (hereinafter called Reynolds) leased the following plants: Hurricane Creek Alumina Plant in Hurricane Creek, Arkansas, in which alumina is produced from bauxite ore; the J ones Mills Aluminum Reduction Plant in Jones Mills, Arkansas, and the Troutdale Aluminum Reduction Plant in Troutdale, Oregon, in both of which alumina is reduced to aluminum metal; and the McCook Rolling Mill in McCook, Illinois, in which aluminum is fabricated for industrial use.
In 1946, Kaiser Aluminum & Chemical Corporation (hereinafter called Kaiser) leased the following three plants: the Baton Rouge Alumina Plant in Baton Rouge, Louisiana, in which alumina is produced from bauxite ore; the Mead Reduction Plant in Spokane, Washington, in which alumina is reduced to aluminum metal, and the Trentwood Aluminum Rolling Mill in Spokane, Washington, in which aluminum is fabricated for industrial use.
It should be observed that defendant’s initial disposal of these plants to Kaiser and Reynolds was by means of a leasing arrangement. After several years, however, both Kaiser and Reynolds had realized a considerable measure of success in operating these plants. They had succeeded in their apprenticeship; they were now ready to buy. Early in 1948 [2] defendant entered into negotiations with both plaintiff and Reynolds to sell plaintiff the three plants which plaintiff was leasing and to sell to Reynolds the four plants which Reynolds was leasing. The sale of the Kaiser plants was concluded first. After lengthy negotiations, Mr. Henry J. Kaiser and Admiral Paul Mather of the War Assets Administration met at a luncheon conference on July 27, 1949. At that time the parties reached an agreement on the price, *644 $36,000,000, for the three Kaiser plants. At that conference, Admiral Mather signed a letter the contents of which have given rise to this litigation. The letter reads:
Dear Mr. Kaiser:
It is understood that the War Assets will not offer the same type of plants to Reynolds Metals or others on a more favorable basis. In the event that circumstances now unforeseen result in a more favorable disposal of such plants Permanente shall receive corresponding treatment and the disposal documents and obligations and rights therein contained for these three plants (Baton Rouge, Mead, and Trentwood) will be modified and adjusted accordingly.
Yery truly yours,
(s) Paul L. Mathee,
Bear Admiral, U.S.N. (Retired), Liquidator
On July 29, 1949, a further letter was sent to Mr. Kaiser which specified the four Reynolds plants as the type of plants to which reference had been made.[3]
After the Kaiser sale, Reynolds reopened its purchase negotiations. Reynolds purchased the four surplus aluminum plants in December 1949 for $50,819,937.12.[4]
The plaintiff asserts that a more favorable contract was made with Reynolds and that as a consequence plaintiff is entitled to compensating damages.
While the letter is couched in general terms, the only practical way to determine whether one purchaser was treated more favorably than the other is to match terms in so far as they are comparable, to analyze the advantages and disadvantages in the two contracts, and upon this analysis to determine whether an adjustment should be made pursuant to the terms of the letter.
The plaintiff has selected five items in which it asserts more favorable term treatment was given Reynolds. It is these items on which plaintiff bases its claim for damages. The five items around which plaintiff alleges damage claims are fume control, carbon-electrode capacity, acquisition costs, interest, and backdating. We proceed to examine each of these items seriatim and inquire as to whether, viewing each *645 item on an over-all basis, Kaiser was discriminated against. If, from this over-all approach, it is shown that the plaintiff has been materially disadvantaged, then to that extent the defendant is in breach.
A. Fume Control
Plaintiff asserts that it was necessary to install a fume control system at its Mead plant in 1951. Plaintiff says that the defendant had contracted to pay 60.61 percent of the cost of a fume control system at the Troutdale plant operated by Reynolds. Kaiser therefore contends that since Reynolds received a fume control system at 39.39 percent of its cost, Kaiser is entitled to recover 60.61 percent of the cost of installing fume controls in the Mead plant in 1951 and 1952.[5]
The circumstances at the time of sale with respect to fume control were very different between the Reynolds Troutdale and the Kaiser Mead plant. The Reynolds sales contract contained the following provision: “Seller agrees to complete the installation of the fume control equipment at the Troutdale Aluminum Reduction Plant in accordance with the terms of the contract * * * of May 25, 1949.”[6] There was no outstanding contract to install fume controls at the Kaiser Mead plant.
The fume control problem at Troutdale was of long standing. The Troutdale plant is located in a rich agricultural region in Oregon, studded with nurseries and dairy farms. The fluorine gases generated as a result of the electrolytic process which reduces alumina to aluminum are potentially injurious to animal and plant life. A stopgap fume control system[7] was installed by the defendant at Troutdale, therefore, when Reynolds was still defendant’s lessee. However, the stopgap system failed to allay the complaints made against the fumes generated by the Reynolds plant, and the plant on June 1, 1948, was threatened with an injunction against its continued operation, plus damage claims amounting to $1,500,000 for alleged injuries to cattle and gladioli.[8]
*646 Because of the gravity of tbe fume control problem at Troutdale, there was an outstanding contract for the installation of fume controls at Troutdale and none for the installation at Mead. Moreover, there were fume damage indemnity provisions in the Reynolds leases and none in the Kaiser lease. Of course the most important distinguishing element is that the fume control problem at Troutdale was, due to location, far more severe than the fume control problem at Mead.[9] Mead, like Reynolds’ Jones Mills Plant, was located in a dry timbered region which was not adjacent to a highly developed farming area. One $2,000 claim was all that Kaiser could produce to demonstrate a fume control problem at Mead.[10] In Troutdale, on the other hand, $150,000 of claims arose before 1946, and almost a million dollars have been spent under the indemnity clauses. Other claims are still pending.
We believe the findings of the trial commissioner clearly show that the fume control problem at the Reynolds Trout-dale plant was fundamentally different both in extent of outstanding obligations and in degree from the problem at the Kaiser Mead plant. If there had been an earthquake at Troutdale and the defendant had agreed to pay 60.61 percent of the cost of rebuilding the aluminum reduction plant at Troutdale, would the plaintiff then have the right to claim as damages 60.61 percent of the cost of the plant building at Mead even though the plaintiff did not build a plant until after the sale and then not because of an earthquake but because of fear of one? Plaintiff’s argument places too scholastic an interpretation on the letter of July 27, 1949. We think the claim is unwarranted.
B. Oarbon-Electrode Capacity
This aspect of plaintiff’s claim is addressed to amounts expended by the defendant to make a Reynolds plant, Jones Mills, fully operable. Plaintiff compares these amounts with amounts spent by it to make its Mead plant fully operable. The plaintiff asserts that subsequent to the sale it had to make expenditures to deal with a carbon-electrode de *647 ficiency at Mead. The plaintiff now wishes to claim these expenditures as damages. In short, the plaintiff says: to make Mead fully operable we had to put out money while the money that was needed to make Jones Mills fully operable was put out by the defendant. However, here as elsewhere the plaintiff is asking us to compare its beans with the Reynolds’ potatoes. The expenditures at Jones Mills were for reconditioning pot lines while those at Mead were for overcoming a carbon-electrode deficiency. Moreover, the trial commissioner’s findings show that during the lease period, no requests were made by Kaiser for additional carbon electrodes for its Mead plant under the lease entitling Kaiser to ask for additional carbon electrodes. Indeed, the trial commissioner has found that in the course of the sales negotiations the Kaiser representatives adverted to the elimination of the carbon obligation in the Mead lease as one of the advantages to the defendant of a sale. In fine, we think there is no merit in this claim.[11]
C. Acquisition Costs
Plaintiff bases this aspect of its claim on the ground that in computing Reynolds’ acquisition costs, deductions were taken which had not been taken in computing the Kaiser acquisition costs. The term “acquisition costs” is used here to refer to the original cost to the defendant of constructing and equipping the plants in question. Defendant sold the two sets of plants to plaintiff and to Reynolds at 39.39 percent of their “acquisition costs.” The plaintiff concedes, and the trial commissioner has found, that plaintiff and defendant could not agree on the correct acquisition cost figure for the Kaiser plants. Consequently, the final sales price to Kaiser was a negotiated figure.[12] Subsequently, defendant determined that the Kaiser sales price was 39.39 percent of the plants acquisition costs. Defendant therefore resolved to adopt the same procedure in determining the Reynolds sales price.
Although conceding that the same percentage of cost acquisition was used, the plaintiff protests that the two sets *648 of acquisition cost figures were not computed in the same manner. The plaintiff points to deductions from acquisition costs granted to Reynolds for bath material, pot refining, surplus property, and stopgap fume control which were not granted to it. Any discussion of whether these deductions were fair and reasonable to the plaintiff should take into account that Reynolds was forced to purchase excess capacity at Hurricane Creek, a power plant at Jones Mills, and a sinter plant at Hurricane Creek: these were all purchases for which the Kaiser sale presents no parallels.[13] Indeed, the trial commissioner has found that during the course of the negotiations with Reynolds, the Government negotiators were accused of being prejudiced in favor of Kaiser.
We think it might fairly be argued that the deductions granted Reynolds are offset by the fact that Reynolds had to purchase sinter and power plants while Kaiser, because of location and circumstance, was relieved from the necessity of making similar purchases. However, we find this claim is unwarranted on another ground: the plaintiff had no corresponding set of circumstances at its plants which would warrant or even permit the deductions given to Reynolds. Kaiser cites four adjustments made in the calculation of the acquisition costs of the Reynolds plants: bath materials, pot refining, surplus property, and stopgap fume control. For these adjustments, plaintiff seeks damages. We proceed to consider these items.
First, the plaintiff seeks damages for the defendant’s treatment of bath materials with regard to Reynolds. In the aluminum reduction process, the electrolyte in the pot consists entirely of cryolite. The cryolite and its additives are called bath materials. The bath is gradually consumed in the production of aluminum. In the computation of Reynolds’ acquisition costs, the estimated costs of bath absorption at Jones Mills were deducted from the capitalized cost for each plant. This was done to adjust the original cost of the facilities leased. No similar deduction is itemized in the adjusted costs for the Mead plant stated in the war assets valuation report on the Kaiser plants. We conclude from the evidence that, in regard to the bath materials, be *649 cause of the different circumstances of each sale the parties were differently but fairly treated. When Kaiser began operations at Mead, it was given by the defendant $274^000 worth of bath materials then present at the plant. During the lease period, Kaiser received $120,000 worth of bath materials from War Assets. The record does not show that Reynolds received any free materials. We do not think that the deduction of the bath absorption at Jones Mills and Troutdale from the capitalized cost for each plant in the computation of Reynolds’ acquisition costs resulted in any unfairness to Kaiser.
Second, plaintiff has entered a claim for pot relining. Kaiser claims that it is entitled to have its costs reduced by the amount subtracted from the Reynolds’ costs for the expense of removing the old pot relinings. This deduction arose out of the belated rehabilitation of the Reynolds’ Jones Mills plant.
Third, plaintiff claims that deduction of the cost of surplus material which had been transferred from the Reynolds plant or used in their rehabilitation was improper because no deduction for surplus material was made in the computation of Kaiser costs.
Fourth, plaintiff contends that the cost of the stopgap fume control system installed at Troutdale in 1946 was deducted from the Reynolds’ costs. We think the plaintiff’s damage claim on the basis of the deduction given Reynolds for the stopgap fume control system is a good example of the complete absence of circumstances on the plaintiff’s side which could permit the allowance of a similar deduction to Kaiser. There simply was no stopgap fume control system at any Kaiser plant. Since Kaiser had no comparable property, how in reason could the defendant be expected to make a comparable deduction ? There was no stopgap fume control system at a Kaiser plant because there was no fume control problem at any of Kaiser’s plants comparable to the one that existed at Reynolds’ Troutdale plant.
We conclude that the claims for differences in treatment of pot relining, surplus property, and stopgap fume control are all susceptible to the same fatal objection. The evidence does not show that the conditions at the Reynolds plants *650 wliich led to tlie award of these deductions to Reynolds were present in the Kaiser plants. What is decisive in this case is not whether as to certain particulars these two purchasers were treated differently but whether viewing these particulars together Kaiser was treated unfairly in comparison with Reynolds. The claims based on pot relining, surplus property, and stopgap fume control all hinge on the same issue: were there similar factors operating in the Kaiser plants that would permit deductions to Kaiser similar to those extended to Reynolds? With regard to the items discussed above, the evidence is clear that the answer is in the negative.
D. Interest
Kaiser claims that interest was computed in both the Kaiser and Reynolds sales as though the rent paid subsequent to July 1, 1949, had been paid on that date. Kaiser claims that, as a result, savings of $9,820.58 were realized by Reynolds which were not available to Kaiser. Since Reynolds on its four-plant purchase paid more rent than Kaiser on its three-plant purchase, Reynolds realized more in the way of savings as a result of treating rent paid after July 1, 1949, as if it had been paid on July 1. Basically this claim is dependent on whether there was any unfairness in the selection of July 1,1949, as the effective date of sale for both sales. Since the plaintiff has asserted other claims for damages which it alleges were also incurred as a result of the ¡selection of the July 1 date, we shall proceed to inquire whether on an over-all basis the selection of the July 1 date was discriminatory or unfair to plaintiff.
E. Backdating
The sale to Kaiser was concluded on July 27, 1949. The Reynolds’ sale occurred on December 21, 1949. Both sales were made effective on July 1, 1949, and both purchasers stopped paying rent and began the payment of interest as of that date. The result of the selection of July 1,1949, as the date of effective sale was to grant Reynolds 174 days of rental forgiveness and Kaiser only 27 days of rental forgiveness. Although it is our view that on an over-all basis the Reynolds “deal” was nearly equivalent to the Kaiser “deal,” *651 we believe that in regard to backdating, the treatment of these two companies was unfairly dissimilar. The defendant says that the selection of the same date as the effective date of sale for both purchases merely illustrates the general policy of equal treatment which it observed in dealing with these two companies. We think this reasoning does homage to equality in form but not in substance. As the plaintiff says, such a theory would permit the defendant any amount of backdating. Presumably if Eeynolds had decided to buy the plants in December 1959 rather than in December 1949 it still would have been permissible to have the sale treated as effective on July 1,1949.
Kaiser claims the difference between the Reynolds’ rent canceled,[14] $1,921,631.01, and the Kaiser’s rent canceled, $249,345.71. This yields a figure of $1,672,285.30. Such an amount, however, cannot possibly represent the fair measure of the Reynolds’ advantage over Kaiser because it does not offset against the amount of rental foregiveness the amount that had to be paid on interest. The establishment of July 1, 1949, as the effective date of sale resulted in granting benefit and detriment — in unequal portions — to the two companies involved. On the credit side of the company ledger, rental obligations accruing after the effective date of sale were forgiven. On the debit side of the ledger, however, from July 1, 1949 forward, the companies were required to pay interest. Reynolds had to pay interest on its purchase price for the 174-day period from July 1 to December 21, computed at 4 percent, a sum of $954,986.82. Kaiser had to pay interest on its purchase price for the 27-day period from July 1 to July 27, computed at 4 percent, a sum of $106,520.55.
To arrive at the actual measure of the Reynolds’ advantage over Kaiser we have utilized the following formula: we have subtracted the rent forgiven Kaiser minus the interest expended by Kaiser from the rent forgiven Reynolds minus the interest expended by Reynolds. The following table indicates the measure of advantage realized by Reynolds over Kaiser:[15]

*652
Reynolds

Eent forgiven-$1,921,631.01
Interest paid- 954,986.82
966,644.19

Kaiser

Kent forgiven- 249,345.71
Interest paid_ 106,520. 55
142,825.16

Over-all comparison

Eeynolds: Eent forgiven minus interest— $966,644.19
Kaiser: Eent forgiven minus interest- 142,825.16
Difference- 823,8191.03
However, the exact difference between the rent forgiven Eeynolds minus interest compared with the rent forgiven Kaiser minus interest cannot be the measure of Kaiser’s damages. It must be borne in mind that on its sale Kaiser paid $36,000,000. Eeynolds, on the other hand, paid $50,-819,937.72. We think that if the Eeynolds and Kaiser companies are to be given equal treatment with regard to backdating, it must be on the basis of a ratio of the Kaiser purchase price to the Eeynolds purchase price which we find to be about 70 percent. It should also be remembered that Eeynolds received a saving of almost ten thousand dollars because all rent paid by the parties after July 1, 1949, was treated as if it had been paid on July l.[16] Taking all these facts and circumstances into account, we find the amount of $583,549.00 is adequate to equalize matters between these two companies in regard to backdating. We believe this amount will put Kaiser on the same basis with Eeynolds with regard to the main advantage obtained by backdating, rent forgiven, and with regard to the main disadvantage resulting from backdating, the running and payment of interest.
During the course of this opinion we have assayed the plaintiff’s various damage claims. We believe that a com *653 parison of the Reynolds and Kaiser transactions reveal that, on the whole, the agreement set forth in the letter of July 27, 1949, was honored by the defendant with a single and substantial exception. As to that exception (the plaintiff’s claim for damages resulting from backdating the sale in both transactions to the same date), we think the evidence discloses a breach of the agreement of July 27. Therefore, we think as to that claim, the plaintiff is entitled to damages.
Judgment will be entered for the plaintiff in the sum of $583,549.00.
It is so ordered.
Durfee, Judge; Laramore, Judge, and Madden, Judge, concur.
Whttaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of Delaware. Its principal offices are in Oakland, California. Prior to November 28,1949, it was named The Permanente Metals Corporation. In these findings the term “Kaiser” refers to plaintiff Kaiser Aluminum and Chemical Corporation and the same corporation when it was named The Permanente Metals Corporation.
2. Reynolds Aluminum Company (hereinafter referred to as “Reynolds”) is a corporation organized and existing under the laws of the Commonwealth of Virginia. It is a wholly owned subsidiary of Reynolds Metals Company (hereinafter also called “Reynolds”), which is also organized and existing under the laws of the Commonwealth of Virginia.
3. During World War II defendant, acting through the Defense Plant Corporation (hereinafter called “DPC”), built a number of plants in the United States for the production of alumina from bauxite ore, for the reduction of alumina to aluminum metal, and for the fabrication of *654 aluminum metal for industrial use. Among these plants were: The Baton Eouge Alumina Plant (Plancor 226-AO) in Baton Eouge, Louisiana, and in which alumina is produced from bauxite ore; the Mead Eeduction Plant (Plancor 226-S), in Spokane, Washington, and in which alumina is reduced to aluminum metal; the Trentwood Aluminum Polling Mill (Plancors 524 and 1061), in Spokane, Washington, and in which aluminum metal is fabricated for industrial use. These three plants, which are sometimes referred to hereinafter as the “three Kaiser plants,” were leased to Kaiser by defendant at various times in 1946 and were operated by Kaiser under lease until their purchase in July 1949.
4. During World War II, defendant, acting through DPC, also built the following four aluminum plants, among others: Hurricane Creek Alumina Plant (Plancor 226-X) in Hurricane Creek, Arkansas, in which alumina is produced from bauxite ore; the Jones Mills Aluminum Eeduction Plant (Plancor 226-K) in Jones Mills, Arkansas, and the Trout-dale Aluminum Eeduction Plant (Plancor 226-0) in Trout-dale, Oregon, in both of which alumina is reduced to aluminum metal; the McCook Eolling Mill (Plancor 654) in Mc-Cook, Illinois, in which aluminum metal is fabricated for industrial use. These four plants, which are sometimes referred to hereinafter as the “four Eeynolds plants,” were leased to Eeynolds by defendant at various times in 1945 and 1946 and were operated by Eeynolds under lease until their purchase in December 1949.
5. On July 27,1949, following negotiations described more particularly in subsequent findings, defendant, acting through the Liquidator of War Assets of the General Services Administration (hereinafter called “GSA”), and plaintiff entered into a contract for the purchase by plaintiff of the three Kaiser plants which plaintiff had been leasing from defendant. The sales price was $36,000,000.
6. On December 15, 1949, the defendant, through the Liquidator of War Assets of the GSA, and Eeynolds entered into a contract for the purchase by Eeynolds of the four Eeynolds plants which Eeynolds had been leasing *655 from the defendant. The aggregate purchase price was $50,081,958.
7. By this action, the plaintiff seeks damages for breach of its contract for purchase of the three Kaiser plants, claiming that the disposal of the four Reynolds plants had been accomplished on a basis more favorable to it than had been the disposal of the three Kaiser plants to the plaintiff.
8. By the terms of the Surplus Property Act of 1944, 58 Stat. 765, Congress declared the general objectives of the act to be, among others, as follows:
(a) to assure the most effective use of such property for war purposes and the common defense;
(b) to give maximum aid in the re-establishment of a peace-time economy of free independent private enterprise, the development of the maximum of independent operators * * *
(d) to discourage monopolistic practices and to strengthen and preserve the competitive position of small business concerns in an economy of free enterprise * * *
* * * * *
(1) to effect broad and equitable distribution of surplus property; * * *
*****
(p) to foster the development of new independent enterprise; * * *
*****
(r) to dispose of surplus property as promptly as feasible without fostering monopoly or restraint of trade, * * *
*****
(t) except as otherwise provided, to obtain for the Government, as nearly as possible, the fair value of surplus property upon its disposition.
9. Section 19 of the Surplus Property Act of 1944 directs the Surplus Property Board, created by the terms of the Act, to report to the Congress as to any plant which had cost the Government more than $5,000,000, including aluminum plants, as to the amount, cost and location of the property together with descriptive information relative to the use of the property, the economic problems that might be created *656 by disposition of the property and the submission of a plan or program for the care, handling, disposition, and use of the property consistent with the policies and objectives set forth in the Act.
10. On September 21, 1945 the Surplus Property Board submitted its report concerning aluminum plants and facilities to the Congress. The conclusions stated by the Board in its report as the basis for the disposal program which the Surplus Property Board was then forming are shown below:
1. The Aluminum industry in this country is still dominated by the Aluminum Co. of America.
2. The promotion of competition through Government plant disposal will foster greater production, employment, and the use of more of the Government facilities than will a continuation of the present situation. It will promote national security.
3. The key to disposal to private enterprise of the largest possible amount of the Government investment lies in bringing a new producer into the Hurricane Creek alumina plant, preferably a producer who also will operate reduction capacity. The output of the alumina plant must be made available to any other producers taking over Government reduction plants at a price that will permit competition with Alcoa. Fortunately, the operator of Hurricane Creek can sell to others at or near cost because the larger his output, the lower his average cost and the greater the saving in the cost of the alumina he consumes himself.
4. The Hurricane Creek plant can operate at least for an interim period of some years with bauxite supplied by independent mining companies in Arkansas, augmented by the stockpile held by the Government. This will afford time in which reduction plant operators can arrange for foreign reserves of high-grade bauxite. It is desirable to explore whether some foreign bauxite may become accessible under international settlements of wartime obligations and from Japanese mandated islands.
5. A number of plants have the disadvantages of poor location, large capacity, and specialized products. It is necessary for the Government to make engineering studies of what must be done to recover the greatest possible portion of the investment and to take certain measures including plant alterations and diversifications of equipment, provided the cost will be recoverable.
6. If it is necessary to do so Congress should consider modifying the laws affecting the price of power sold *657 from Federal projects in order to remove disadvantages in costs arising from inflexible power contracts with aluminum producers.
7. The total primary aluminum capacity in this country exceeds immediate postwar market requirements, but there should be room now for new producers, having their own fabricating capacity or other market outlets, to gain a foothold in the industry by sharing existing markets and contributing to the expansion of those markets. The Army and Navy Munitions Board has recommended to Congress a stockpile of primary aluminum and bauxite for national defense, and Government policy can also be shaped, if necessary, to enable new producers, along with established old producers, to contribute to that stockpile.
8. The volume of surplus secondary aluminum is so great that a program should be adopted to spread this supply over a number of years for the purpose of encouraging permanent new uses, promoting competition in the processing of aluminum, and avoiding the discouragement of new producers from entering the primary aluminum industry.
9. The problems of promoting new competition call for liberal terms of lease or sale of plants with prices to be determined by earning, ability. It will be necessary for the Government to aid in offsetting the subsidized advantages of the Aluminum Company of Canada.
The report concluded as follows:
The Board therefore recommends a program in which the Government places its full backing behind new competition in the aluminum industry.
THE RECOMMENDED COMPETITIVE PROGRAM
1. Priorities of disposal. — The following priorities will apply to all plants and equipment owned by the Government, regardless of the amount of investment:
a. Prospective competitors of Alcoa will have first choice of plants and equipment.
b. Alcoa will be given the opportunity to take over certain desired facilities, subject to approval of the Attorney General, but only under terms of lease or sale that give no competitive advantage over others.
c. The Government will consider maintaining in stand-by condition individual plants as necessary insurance for the national defense upon recommendation of the War and Navy Departments.
*658 d. Other facilities will be offered to private enterprise wishing to use buildings or equipment for purposes other than aluminum production.
e. Plants and equipment not otherwise needed may be exported to members of the United Nations, subject to approval of the State, War, and Navy Departments.
The foregoing priorities may be modified in cases where research on aluminum processes and products can be fostered by selling, lending, or donating equipment that would not otherwise be used in the aluminum industry, provided the results of such research would become public property.
2. Preferences among bidders for Icey plants. — It is essential that key plants be disposed of to those bidders who have the organizations, experience, and financial resources that afford the greatest prospects for successful survival and maximum production in industry. Preference will therefore be given to such candidates.
3. Individual plant disposal. — The plan of the Board is to dispose of plants as follows:

Almni/na plants:

Hurricane Creek will be offered to a competitor of Alcoa under terms that guarantee the sale of alumina to others on a basis assuring a competitive price.
Baton Bouge will be offered in Avhole or part to a competitor of Alcoa. If no competitor of Alcoa can be found who believes that the plant can be operated in its present location, the Board will consider the desirability of removing some or all of the equipment to the Pacific Northwest for any competitor. If these arrangements cannot be made, the plant or part of it will be offered to Alcoa for removal to the Pacific Northwest, subject to approval of the Attorney General.

Lime-soda-sinter facilities:

These facilities are adjuncts to the Alcoa owned alumina plants at Mobile and East St. Louis. They will be offered to Alcoa, subject to approval of the Attorney General, on terms that confer no advantage in production coste over competitors.

Bemicommercicd alwnina plants:

These four small plants will be kept in production until they have had time to demonstrate the feasibility or lack of feasibility of the processes. They will then be offered to the operators. Those not accepted will be turned over to the Bureau of Mines for experimental work under authority already possessed by the Bureau.

*659
Reduction -plants:

Jones Mills, Troutdale, Spokane, and Tacoma will be offered to competitors of Alcoa. Undisposed-of plants may be held in stand-by for an indeterminate period because of the prospective commercial value of these plants when aluminum markets expand substantially.
Massena will be offered on lease to Alcoa, subject to approval of the Attorney General, upon terms that confer no advantage over competitors. This plant will be held by the Government until possibilities are determined for disposal to others when a low-cost power supply becomes available.
Maspeth, Burlington, Los Angeles, and Riverbank. If unacceptable to any bidders, these plants will either be held in stand-by upon recommendation of the Army and Navy Munitions Board or else disposed of according to the recommended priorities.

Scrambled equipment in primate plants:

First choice will go to owners of the plants in which the equipment is located. Equipment not thus taken will be disposed of according to the recommended priorities.

Fabricating plants:

Holders of valid options or rights of first purchase will have first choice to exercise their rights. First choice on plants not under option and second choice on plants subject to prior rights of others will be granted to any operators of Government reduction plants in order to enable them to integrate their business more favorably. Third choice will go to any others according to the recommended priorities.
4. Terms of lease or sede. — The alumina, reduction, and large fabricating plants will first be disposed of by sale or lease to competitors of Alcoa. It may be that conditions will not justify the Government in making sales of these key plants until experience has demonstrated survival prospects.
Facilities sold to Alcoa and other facilities including smaller fabricating plants sold to others will be disposed of by lease or sale, according to the circumstances.
Rental terms and sales prices will be fixed with due regard to earning ability of the plant and not necessarily with regard to original cost or replacement value. On alumina and reduction plants, leasing terms may be offered, if necessary, as favorable as those received by Alcoa under its original lease. These terms may provide for the RFC to stand losses for an initial period, *660 for the profits to be shared 85 percent to the Government and 15 percent to the operator, and in addition for the NFC to review and approve the price at which metal is sold, the top salaries, and extraordinary expenses. It is the belief of the Board that the operators should assume some of the risks. Should the operators wish a larger share of the profits, terms would call for greater assumption of risks by them. In any event, the RFC will require that the operators assume reasonable risks of working capital and that the Government withdraw its assumption of other risks after some fair period.
5. Measures of Government support. — The following general measures will be undertaken by the Surplus Property Board or under its direction in order to facilitate the success of new producers in meeting basic problems:
a. Bauxite supply. — The Government stockpile of bauxite at Hurricane Creek will be available to the plant operator. In addition, the Board will ask the help of the appropriate Federal agencies in exploring the possibilities of securing foreign ore by means of international agreements.
b. Engineering investigations will be made to determine changes necessary to place plants in the most advantageous position to compete, and the Government will finance such changes where the costs appear to be recoverable.
c. The Board to put into effect the policies already described to control the disposal of surplus secondary metal so that its maximum use is promoted without discouragement of new primary metal producers.
CONCLUSION
The Board reiterates its belief that in the case of the aluminum plants the objectives of the Surplus Property Act of 1944 can best be accomplished by a disposal plan that will promote competition in the industry. The program described in this report in the opinion of the Board seems more likely to promote competition and thus to achieve the purposes of the statute than any other proposal that has been called to the Board’s attention, The Board recognizes that conditions beyond its control may make this program impossible of accomplishment. In that event, unless the courts dissolve or reorganize Alcoa under the Sherman Act, it will be for Congress to consider whether to leave the aluminum industry under the domination of one company or *661 whether to authorize the Government either by subsidized or direct operation of key plants to provide some measure of production that is independent of Alcoa’s control.
XL The references in the preceding finding to court action under the Sherman Act relate to a proceeding instituted prior to the war in the New York Federal Court by which the Government sought relief against monopolistic practices it charged against the Aluminum Company of America. In 1945, Judge Learned Hand, in a decision of the Circuit Court of Appeals, sitting specially in the place of the Supreme Court, said:[17]
* * * In view of these declarations of the purpose of Congress, the “agency” which the Board “designates” to dispose of the plaintiff’s “aluminum plants and facilities” may well believe that it cannot do so without some plan or design for the industry as a whole, some comprehensive model which shall, so far as practicable, reestablish “free independent private enterprise,” “discourage” monopoly, “strengthen” small competitors, “foster” independents and not foster “monopoly or restraint of trade.” If it should find this method desirable, it would have to learn what purchasers were in the market, how strong they were, what units they could finance and operate, and in what position they would be to compete. In such a model or design the “agency” would have to assign a place to “Alcoa,” and that place no one of course can now anticipate. Conceivably “Alcoa” might be left as it was; perhaps it might have to be dissolved; if dissolved, the dissolution would depend upon how the other plants were distributed. If the “agency” should find it wise to proceed in this way, it may succeed in inducing “Alcoa” to accept the place assigned to it, particularly if the plant has not been prepared ex parte. If it does not succeed, then, but then only, will it be appropriate for the district court to act. We do not of course mean that in deciding whether to dissolve “Alcoa,” or how to do it, that court must be governed by any plan which the “agency” may have devised, if it does devise one. But, plan or no plan, it must wait until it learns what the “agency” has in fact done. Moreover, if the “agency” does form a plan, it will have been an attempt to realize the same “objectives” for which the court itself must strive; and the *662 court may well feel that it should accord to the “agency’s” plan that presumptive validity which courts are properly coming more and more to recognize in the decisions of specialized tribunals. Nothing which we now say ought in any measure to limit the discretion of the “agency” to proceed in this way. * * *
12. On July 1, 1946 the plaintiff leased the Trentwood Rolling Mill from the defendant for a term of five years with an option to renew for an additional two years on six months’ notice prior to the expiration of the five-year term. Rental was to be computed at 5 percent of net sales, or a minimum annual rental whichever was higher, as follows:

Minimum, Year

$250,000_First
$660, 000_Second
$1,336,000_Third
$2,000,000_Fourth
$2, 667,000_Fifth and later years
The plaintiff was given the option at any time up to six months prior to the expiration of the lease, as extended, to purchase the leased facilities, the option price to be the greater of:
1. reproduction cost at July 1, 1946 less depreciation to that date, plus 4 percent interest from July 1, 1946 less rentals, plus interest at 4 percent from date of rental payments, or
2. present depreciated reproduction cost less depreciation at the rate or rates allowed by the Bureau of Internal Revenue on similar facilities, with a 25 percent floor.
This lease was terminable by the plaintiff at the end of the first year on ninety days’ prior notice to the defendant, or at the end of any subsequent year on six months’ prior notice.
On October 15, 1947, the lease was amended as to term, but the exhibit in evidence is not clearly readable.
On March 4, 1948, the lease was further amended by the second supplemental agreement by which rental under the Trentwood lease was to be credited by the amount of expenditures by the plaintiff made in connection with purchase and installation of two new 600 KW turbogenerators at the Baton Rouge alumina plant.
*663 13. On July 19, 1946, the plaintiff leased the Mead reduction plant at Spokane from the defendant for a term of five years with an option to renew for an additional two years on six months’ notice prior to the expiration of the five-year term.
Eental was payable monthly in advance, calculated separately for each pot line as follows:
1. For the first year at the annual rate of $104,000 for each pot line which has been or is placed in condition to operate during such year.
2. For the second year at the annual rate of $130,000 for each pot line which has been or is placed during such second year in condition to operate.
3. For the third year at the annual rate of $156,000 for each pot line which has been or is placed during such third year in condition to operate.
4. For the fourth year at the annual rate of $182,000 for each pot line which has been or is placed in condition to operate during such fourth year.
5. For the fifth year and any succeeding year at the rate of $208,000 for each pot line which has been or is placed in condition to operate during such fifth year, provided * * * the minimum annual rental during each year shall be not less than the following amounts:

Minimum "Year

$208,000_First
$260, 000_Second
$468,000_Third
$728,000_Fourth
$1, 040,000_Fifth and later years
The Government agreed to require Eeynolds Metals Company, as lessee and operator of the Government-owned plant at Hurricane Creek, Arkansas, to furnish alumina to the plaintiff in the event plaintiff should have an insufficient supply in amounts and on terms and at prices “as will foster the maximum amount of competition in the aluminum industry.”
By the further terms of this lease the defendant agreed, in the event it was determined that the electrode capacity was insufficient to supply the full requirements of the pot lines which the plaintiff requested the defendant to place in condition to operate, to either construct additional electrode capacity to meet the deficiency, or supply electrodes to the *664 plaintiff from other sources at prices and terms as mutually agreeable.
The plaintiff was given the option to purchase the leased premises at any time up to six months prior to the expiration of the lease including renewal or extension at the higher of:
1. Reproduction cost at July 19, 1946, less depreciation to that date, plus interest at 4 percent from that date, less rentals plus interest at 4 percent per annum from the date of rental payments, or
2. Present depreciated reproduction cost, less depreciation at the rate or rates allowed by the Internal Revenue Service on similar facilities for income tax purposes with a floor of 25 percent residual value.
14. On November 1, 1946, the plaintiff leased the Baton Rouge alumina plant which the plaintiff was then operating under a letter of intent of August 16, 1946. The lease did not include the sinter plant. The period of the lease was to December 31, 1949, with an option to renew by the lessee through June 1953 on notice prior to July 1, 1949. If the option to renew was exercised, the plaintiff had a further ten-year option on notice.
Rental was computed on a graduated guaranteed minimum rental from $126,500 for first year to $252,900 the fifth and succeeding years, based upon the plaintiff operating the plant at 25 percent of estimated rated capacity of alumina produced. These mínimums were subject to adjustment upwards if production exceeded 25 percent of rated capacity of the plant.
The minimum rentals were arrived at by reference to a percentage of fair value of the plant. This fair value for rental purposes was stated to be 70 percent of $18,071,428, the approximate war-time cost of the plant to the Government. (This figure did not include any part of the cost of two turbogenerators.)
The plaintiff was given a right to construct a dock at its expense on the leased premises and submerged waters adjacent. Cost of such dock if constructed was not to be considered in determining price in event of sale of the leased premises to the plaintiff. In event of termination of lease, plaintiff was to have the residual rights in the dock with *665 access thereto for 10 years, subject to the right in the defendant to buy out those rights on payment of the cost of dock, less depreciation.
Plaintiff had an option to purchase the leased premises at any time up to six months prior to termination or expiration on terms similar to those contained in the Mead lease.
15. Paragraph 18 of the terms of the Baton Rouge lease provides as follows:
It is the obligation of Lessor to complete, at its expense, the work necessary to place the plant in condition to operate for the purposes for which it was designed. “Condition to operate” means normal mechanical condition as determined by good engineering practice in the aluminum industry, but with no obligation on the part of Lessor actually to produce alumina in the plant as evidence of such condition, and without limiting the generality of the foregoing, shall include:
a. Installation of motors, meters, delicate instruments, etc.;
b. Complete cleaning and general restoration;
c. Restoration of machine shop to original condition, including removal of all machinery, etc., not part of the alumina plant;
d. Completion of pipelines to new waste and mud disposal area;
e. Completion of auxiliary power house;
f. Installation of two new 6,000 KVA turbo generators as designed.
Any item of machinery, equipment, furniture, fixtures, tools, cranes, conveyors, supplies or other property, located at the plant at the date previous operation of the plant was terminated, shall be returned to the plant, unless Permanente otherwise agrees.
In order to place the plant in condition to operate, Lessor has made available the sum of Three Hundred Ninety One Thousand ($891,000) Dollars, apart from funds to be made available for the installation of the two turbo generators. At Lessor’s request Permanente will perform for Lessor any work necessary to place the plant in condition to operate at cost plus direct plant supervision without inclusion of any general overhead or organization expense and under the supervision of the Engineering Division, Office of Defense Plants, Reconstruction Finance Corporation, or Property Management Division, Office of Real Property Disposal, War Assets Administration. In addition to the work to be *666 gerformed for the account of Lessor, Permanente shall nance and itself perform, or cause to be performed, additional work necessary to place the plant in condition to operate, up to the sum of Two Hundred Sixty-One Thousand Dollars ($261,000).
In consideration of the performance of such work by Permanente at its expense, Permanente shall be entitled to reductions of the rentals otherwise payable pursuant to the provisions of this lease, equal to the sum expended by Permanente pursuant to the preceding paragraph.
Notwithstanding Lessor’s obligation to install two turbo generators and appurtenances as designed, Per-manente shall proceed to purchase and install, at its own expense, two new 6000 KW turbo generators and appurtenances as designed. Permanente shall be reimbursed for the cost thereof in accordance with the terms of the Cost Rehabilitation Contract executed by Lessor and Permanente on March 9,1948.*
Lessor shall have the beneficial ownership and interest in the facilities to the extent of that proportion of the cost and installation thereof as may have been reimbursed at any given time. When the installation is completed and reimbursement in full has been made to Permanente, Lessor shall have full title to the facilities and the same shall become a part of the plant and be treated as capital additions for purposes of the option to purchase pursuant to Article Twenty-four hereof.
Í ‡ ^
16. Apparently there was a separate agreement between the plaintiff and the defendant whereby the latter was to pay a substantial amount of money for the purpose of placing the Mead reduction plant in an operating condition. A substantial sum of money was so expended by the defendant for that purpose. The record does not show the amount. One of the items of substantial expense was the replacement with copper of bus bars, which due to the shortage of copper during the war, had been installed by using silver which had been loaned from the United States Mint.
17. The provisions of the leases by which Reynolds had rented the four Reynolds’ plants prior to their purchase by Reynolds were generally similar to those of the leases between the plaintiff and the defendant as to the three plants which the plaintiff purchased.
*667 As to the Hurricane Creek plant (Reynolds), the defendant agreed to clear the plant and put it into operating condition at its expense with the lessee performing the work on a reimbursable basis at an estimated cost of $812,000.
As to the Jones Mills plant (Reynolds), the defendant agreed at its expense to clear the plant and put it into operating condition, except certain starting costs which were to be borne equally between the lessee and lessor.
The costs which were to be borne by the defendant included the cost of removing silver bus bars, then installed, and replacing them with either aluminum or copper bus bars. The estimated cost of placing the plant in an operating condition was $612,380.
The defendant under the Jones Mills lease agreed to indemnify and save lessee harmless from and against claims, damage and liability asserted by adjacent or nearby property owners due to fume damage from operation of the plant.
The defendant under the McCook (Reynolds) lease, was to clear the plant and place it in an operating condition at its expense at an estimated cost of $235,000.
As to the Troutdale (Reynolds) lease, the cost of clearing the plant and placing it in operating condition, which was to be borne by the defendant, was estimated at $1,360,777. This included, in addition to the cost of replacing silver bus bars, the cost of installation of what is hereafter referred to as “stop-gap” fume control equipment.
The Troutdale lease reads in part as follows:
Twentt-Seven : Lessor agrees to indemnify and save Lessee harmless from and against any and all claims, damages and liability which may be asserted by adjacent or nearby property owners by reason of noxious or poisonous fumes, gases, vapors, or solids arising from the operation of the leased premises. If claims of property owners arising out of operation of the leased premises as above set forth are presented to Lessor in an amount aggregating more than $300,000, then Lessor may make a determination at that time whether or not continued operation of the leased premises would be to the best interests of the Government under the circumstances then existing based on findings of fact to *668 be made by Lessor which would include the following:
(a) Total amount of claims filed,
(b) The extent to which such claims are valid or for which they could be settled, based upon opinion of counsel for Lessor,
(c) Kent theretofore received from the leased premises,
(d) Kental reasonably to be anticipated over the balance of the term.
If, based on such findings, Lessor reaches the conclusion that continued operation of the plant would not be to the best interests of the Government, it shall have the option of cancelling this lease upon six months written notice to Lessee.
Twenty-Eight : It is understood that cryolite in the cells of the potlines covered by this Lease at the time the plant was closed down by the former operator is not contained in the inventory of the materials at this plant but capitalized under the plancor. It is thus considered by Lessor and Lessee that such cryolite is a part of the leased premises to be used by Lessee as part thereof. It is agreed by Lessee, however, that upon cancellation or termination of the Lease it will leave in the cells of the potlines covered by this Lease an amount of cryolite equivalent to that contained therein at the time the plant was closed down by the former operator.
Thirty : In connection with the relining of the pots contained in the pot lines covered by this lease, Lessor agrees to bear the expense of relining all pots which have never been relined since their installation, and to complete the relining of all pots which were out of service at the time the plant was closed down by the former operator.
Lessor also agrees to bear the expense of relining any of the remaining pots of the pot lines covered by this lease which may fail in the starting up period required to obtain seven inches of molten bath in the cells or within a period of fourteen days from the time the current is turned on the pots, whichever period is the shorter.
Lessee shall be responsible for the required relining during the term of this lease of any of the pots contained in the pot lines covered by this lease which were relined within the period of six months prior to the date on which the plant was closed down by the former operator.
*669 Lessor will reimburse Lessee for the cost of relining those pots contained in the pot lines covered by this lease which were relined longer than six months prior to the date on which the plant was closed down by the former operator should they fail within two years from the date on which such pots have in them seven inches of molten cryolite at the time the pot lines are started.
The Lessee assumes full responsibility for any subsequent relining of pots in the four pot lines covered by this lease as they may fail during the term of the lease and agrees to return the plant to Lessor at the time the Lease is canceled or terminated in as good condition as it was when turned over to Lessee, except for normal wear and tear, acts of God, and risks insured against, it being understood that the Lessee is not required to reline any pots not having failed prior to cancellation or termination of the Lease. In the cancellation or termination of the Lease or during the life of the Lease, the Lessee on request agrees to furnish Lessor complete records of pots, construction drawings of plant changes, if any, and to return all drawings and data which Lessor has furnished Lessee.
# # * ❖
18. All of the Reynolds’ leases were amended on October 18, 1948 to extend the term of each lease by 17 years from the beginning of the original term at generally higher rental rates.
19. With the leases outstanding with options to renew available to both Reynolds and the plaintiff, as a practical matter it was feasible to sell the three plants which the plaintiff had under lease only to the plaintiff, and the four plants which Reynolds had under lease only to Reynolds. Both firms knew that the defendant wanted to sell the plants if a price could be agreed upon. Each firm desired to purchase the plants it had under lease if it could do so at a price and on terms favorable to it.
20. When the negotiations toward sale of the aluminum plants began, it was clear that each firm wanted to buy the plants it had under lease and the defendant wanted to receive from each the best price it could get.
21. The negotiations looking toward sale of the aluminum plants began early in 1948 after the War Assets Administrator was able to arrive at an understanding with the Alumi- *670 mim Company of America as to certain patent rights owned by that company. Apparently these patent rights presented no particular problem while the plants were under lease.
22. By June 1948, the plaintiff had demonstrated its ability to conduct its operations in the aluminum business at a very substantial profit. This information was available to and known to the War Assets Administration representatives who were thereafter engaged in negotiations with plaintiff toward sale of the three aluminum plants.
23. By May 31,1948, the total rent paid or accrued by the plaintiff for the three leased plants was $3,226,195, itemized as follows:
$259,119_Baton Bouge Plant
$663,576_Mead Beduction Plant
$2,303,500_Trentwood Bolling Mill
24. On April 8, 1948, following discussions had between representatives of the plaintiff and the defendant, the plaintiff by Chad F. Calhoun, Vice President (who was in charge of the plaintiff’s Washington office) wrote to Jess Larson, Administrator, War Assets Administration, offering to purchase the three Kaiser plants at a price of $28,600,000 with 15 percent down payment and the balance secured by a mortgage payable in fifteen years in equal annual installments with interest on the unpaid balance at four percent, with the then existing arrangements for rehabilitation costs and certain credits on cost of power and the remaining cost of turbo-generators for Baton Bouge to be fully deducted from rentals on the Trentwood plant due July 1,1948.
25. It is not shown in the record whether a reply was sent to the plaintiff’s letter of April 8 but the offer contained therein was not seriously considered because the War Assets’ appraisal staff had arrived at a tentative estimate of fair value of $61,000,000 plus, based on the then present worth of rentals (minimum under leases, except Baton Bouge on a basis of 50 percent of capacity) to be paid over a period of 15 years to which was added 25 percent of depreciated reproduction cost as of July 1,1946. It is fair to infer that this information was communicated to the plaintiff.
26. After serving as General Counsel and Associate Administrator, Jess Larson was Administrator of WAA from *671 December 1947 until June 1949. Admiral Paul Mather was Associate Administrator under Larson, and succeeded him as Administrator in June 1949. On July 1, 1949, after temporarily serving as Public Works Administrator, Larson became Administrator of the newly formed General Services Administration. At the same time, Mather’s title was changed to Liquidator of War Assets, since WAA then became a division of GSA. John Joss, now deceased, was General Counsel of WAA after Larson and continued as General Counsel of GSA. Joss eventually became Mather’s successor as Liquidator of War Assets. Irving Gumbel was Chief of the Chemicals and Light Metals Branch of the Neal Property Disposal Division of WAA throughout its existence. Prior to the existence of WAA, he held essentially the same position in the Reconstruction Finance Corporation.
27. Most discussions leading up to sale of the three Kaiser plants to the plaintiff were had between Chad Calhoun and Jess Larson prior to June 1949, and after that time between Chad Calhoun and Admiral Paul Mather. On three occasions when Henry J. Kaiser attended negotiation sessions, he spoke for the plaintiff. The final negotiation was effected between Henry J. Kaiser for the plaintiff and Admiral Mather for the defendant.
28. On December 27, 1948, Mr. Jess Larson called Mr. Chad Calhoun and told him that Reynolds desired to purchase the McCook rolling mill only. Some mention of 40 percent of cost was made. Larson told Calhoun that he wanted to sell to Reynolds the four plants as a “package”, which that firm ultimately did buy. He stated further that if he sold to Reynolds, he would like to make the same deal with the plaintiff. By that he meant he wanted to sell the plants which the defendant was leasing to the plaintiff. It is clear that Larson was using the Reynolds’ action to spur action toward purchase by the plaintiff.
29. On January 3, 1949, Calhoun and Larson conferred. Larson stated that Reynolds wanted to buy the McCook mill but that he wanted to make a “package deal” on all four Reynolds’ plants. The discussions with Reynolds at that time were reported by Larson to Calhoun to be on the basis *672 that purchase price to Reynolds would be about 50 percent of wartime cost with Reynolds to assume the fume damage and fume control obligation at Troutdale. Larson told Calhoun that he would accept less than 50 percent of wartime cost but not less than 40 percent. Larson further said that the yardstick for a sales price of the aluminum plants was the War Assets’ estimate of probable production revenues from the plants during the unexpired portion of the present Reynolds’ leases. In reporting on this conference to the plaintiff’s home office, Calhoun made a computation for purposes of comparison showing that on the basis of ten times annual rental on Baton Rouge, Mead and Trentwood plants, the price would be $39,780,000 and at 50 percent of wartime cost, which he estimated at $89,900,000, the price would be $44,950,000. His total figures were actually greater due to inclusion in them of amounts for rental and wartime cost of the Newark, Ohio plant, which later was purchased by the plaintiff separately from the transaction in suit.
30. On March 10, 1949, Calhoun had a discussion with Larson on the aluminum plant purchases. Calhoun reduced the substance of the discussion to a memorandum, as follows:
I had a meeting with War Assets Administrator, Jess Larson, this afternoon. I told him that I had reviewed our proposal of April 6th, 1948, in which we had offered $28,600,000 for the (3) aluminum plants; namely, Trentwood, Mead, and Baton Rouge, and had raised that figure to $31,200,000. Also, that I now wanted to include the Newark, Ohio plant and that my analysis of the value to Permanente for the Newark plant was $4,636,000. This would make a total of $35,836,000 for the (4) plants.
I told Larson that our people with whom I had discussed the matter last Friday in Oakland had a fixed maximum purchase price of $31,000,000 in their minds for the (4) plants, but that I felt sure I could get them to agree to the $35,836,000 figure.
I told Larson, however, that I did not want to be wasting his time or that of his staff or of myself in discussing a proposition unless the figure I proposed was worthy of further discussion. Larson told me that the $35,836,000 was within negotiating range but that we would have to come up a little.
*673 Larson will be in Eeno, Nevada, the first of next week. By arrangements made with him 'at the meeting this afternoon he will come on over to San Francisco and then will meet with ns out there next week for further discussion concerning the purchase of the aluminum plants. He is to phone me on arrival in San Francisco.
31. On March 30,1949, Calhoun again conferred with Larson and later prepared a memorandum of the discussion which reads in part as follows:
I told Larson that I was still having difficulty with some of our people on the thirty-five million, eight hundred and thirty-six thousand dollar figure, as they were inclined to feel that that was too high an offer for us to make for the plants. I told him, however, that I felt that the price was one that I could justify for and on behalf of Permanente and one that also the Government could very well justify as the proper value to receive for the plants.
Larson stated that some of his hoys felt that that price was extremely low and would, in effect, tie giving the plants away. I then went on quite a dissertation regarding the values to Permanente and why the figure represented a fair deal both from Permanente’s and the. Government’s standpoint. I told him that I was certain his people had not fully appraised or appreciated the various factors of the valuation that we, as business managers, had to consider in preparing a firm offer to purchase these aluminum plants.
Larson said that if we were really serious about buying the plants and made him an offer at the thirty-five million, eight hundred and thirty-six thousand dollar figure that War Assets would not accept it, but that within a very short time they would make a counter offer to us. I asked him within what range the counter offer would be. He stated that it would be somewhere between the thirty-five million, eight hundred and thirty-six thousand dollar figure and forty million dollars. He said that quite a few of his people would not at this moment think that would be a proper price to make, but he felt that they would, in the face of a real firm offer, support a deal at about that rate.
32. On April 4, 1949, the plaintiff by Chad Calhoun submitted a detailed writen offer to purchase the four plants, Mead, Trentwood, Baton Eouge and Newark, Ohio, for $33,236,000. In commenting on the advantages to the Gov- *674 eminent and tbe advantages and disadvantages of the sale to the plaintiff, the statement was made that the plaintiff had already spent over $4,000,000 of its own funds in improving the leased facilities and insuring their continued operation not including $4,000,000 it was then spending at the Newark facility.
33. On April 6,1949, Irving Gumbel and Arthur B. Mene-fee of the WAA, upon whose judgment Larson was relying in the conduct of his negotiations for the sale of the aluminum plants, wrote a memorandum in which they commented on the offer of April 4, 1949 by plaintiff in the following terms:
Reference is made to a letter from the Permanente Metals Corporation dated April 4, 1949 containing a tentative offer to purchase the four above captioned plants for $33,236,000.
In our opinion this offer is inadequate.
We have previously received an offer from Permanente to purchase the first three of these plants for the sum of $28,600,000, or approximately 32% of the acquisition cost of $90,000,000. This offer was declined. The present offer for the four plants, with an acquisition cost of $112,600,000, represents approximately 29%.
The arguments set forth by the Permanente letter of April 4th are, of course, quite valid, but they do not substantiate the value of $33,236,000. In considering this figure the following factors should be given due weight:
1. The Government has spent $3,373,000 in capital improvements and rehabilitation, which makes the total Government investment in the plants approximately $116,000,000..
2. The estimated annual rentals for the four plants was approximately 4y2 million dollars, so that the offer is equal to slightly over seven (7) years’ estimated rentals.
3. For the twelve (12) months ending August 21, 1948, Permanente Metals Corporation, through the use of these facilities plus the small reduction plant which they purchased from the Government at Tacoma, had net sales of $69,605,000 on which net profits after all charges, including rentals and income taxes was $10,975,000.
Rentals amounted to approximately $4,000,000 for the three plants. If this is added to the net earnings reported, the total is approximately $15,000,000. This figure makes no allowance for other earnings which may *675 be expected to be derived by tbe operation of tbe Newark plant or rental thereon.
4. Any sale of these plants to Permanente will put a ceiling on tbe price of similar plants which will be sold to Keynolds.
The conclusions which we draw is that the price offered by Permanente is inadequate in view of the acquisition cost of the plants, the rentals which the Government may expect to receive from them, and the earnings which Permanente may expect to derive from the operation of the plants.
RECOMMENDATION
We recommend that the offer be declined and that a counter offer be made at $55,000,000.
34. On April 8,1949, Calhoun and Larson again conferred concerning the plaintiff’s offer to purchase the four plants. Larson said that he would be ready in about two weeks to make a counter proposal to the plaintiff. He also said that he preferred to dispose of the plants rather than keep them under lease for a long period, and that it should be possible to arrive at a sales price fair to both sides.
35. On April 16, in a discussion between Calhoun and Larson, the latter stated that the sales price of the aluminum plants should be based upon the rentals which would accrue to the Government over a long period. Calhoun countered with a statement concerning plaintiff’s rights of cancellation under the leases and that they could cancel at the proper time and construct new and modern facilities out of earnings or new capital or both. Calhoun complained of disposals which WAA had made to others which he summarized in his memorandum of the conference as follows :
I also pointed out to Larson that in all of the aluminum plants which they have sold to date, excluding the Tacoma plant to us, that War Assets has recovered only about 25 per cent of the war-time cost but that our offer was in excess of 30 per cent of the war-time cost. I asked the specific question why it was that aluminum plants could be sold to others at such a small percentage of the war-time cost but that for some reason War Assets wanted to exact a very high percentage of war-time cost out of us. I pointed out that we had paid 50 per cent for the Tacoma plant but that on all of *676 the other sales the percentages of recovery by the Government had been much less than we were now-offering for the four plants.
I specifically mentioned the Harvey Los Angeles plant, the Massena deal to Alcoa, the Lister Hill Rolling Mill sale to Reynolds Metals, and the Grand Rapids plant to Reynolds Metals at 22 per cent.
I told Larson that while we were not making our claim or justification for a purchase price based on what they had done to others, still I thought that everyone at War Assets should have a proper p[er.]spective on what they had done in the past and what they were now apparently trying to exact from Permanente.
36. Apparently Larson, together with most of the plaintiff’s senior executives, was present in New York City for testimony in the New York Federal Court in the Alcoa antitrust case on April 19, 1949. They met on that day in the plaintiff’s New York office and conferred concerning the disposal by the defendant of the aluminum plants. Henry J. Kaiser was the plaintiff’s spokesman at this conference. Larson said that his staff recommended to him the submission to the plaintiff of a counter offer from WAA by which it would offer to sell the four plants, including the Newark, Ohio plant, for $55,000,000. Kaiser complained that it was unfair for the Government to take into account the plaintiff’s demonstrated managerial ability and efficiency of operations in arriving at the proposed sales price. At this conference, Larson handed Calhoun a copy of a WAA interoffice memorandum which was a draft of the WAA suggested counter offer and defendant’s analysis of the plaintiff’s outstanding offer to purchase.
37. On April 28, 1949, Larson was appointed Federal Works Administrator. On that day, however, Larson met with Calhoun and Rhoades, plaintiff’s vice president. He told them that because of his new position they should confer on the aluminum plant matter with Admiral Mather and his staff, Messrs. Gumbel, Menefee and Shaffner.
38. On April 29, 1949, Mr. Rhoades and Mr. Calhoun met with Admiral Mather and his staff. This was apparently the first meeting between the plaintiff’s representatives and Mather. Mather said that Larson had reviewed with him at considerable length his philosophy and thoughts concern *677 ing the desirability of the Government selling the aluminum plants and the basis upon which they should be sold, and that Mather agreed with such position. Mather also said that since this was a matter of some magnitude, he wanted to become personally familiar with all phases of it and that he wanted to visit the plants. He said he wanted to be in a position to arrive at a fair and proper price on the plants which he and his staff could substantiate and justify.
39. Between May 12 and June 3, 1949, the plaintiff purchased the Newark, Ohio plant for $4,500,000.
40. Larson, on June 3, 1949, had a conference with Chad Calhoun on other matters but the discussion came around to the disposal of the aluminum plants. Calhoun told him that since at one time the plaintiff could have bought the four plants for $40,000,000, and that plaintiff had since bought the Newark, Ohio plant for $4,500,000, plaintiff would like to know what kind of a deal they could obtain on the remaining three plants. Larson first said WAA might sell the three plants for $33,000,000 but quickly modified his statement to one where WAA would be prepared to sell the three plants for 40 percent of their acquisition costs. Calhoun argued that the Baton Rouge plant just wasn’t worth more than 20 percent of its acquisition cost. Larson said he was merely averaging all of the plants on a 40 percent basis. Figures representing an acquisition cost for the plants at
$18,000,000 for Baton Rouge
22,200,000 for Mead Reduction Plant
47,000,000 for Trentwood
totaling $87,200,000 were then discussed and the 40 percent reckoned at $34,880,000.
Calhoun wanted to know if plaintiff would be given a discount for cash payment. Larson told Calhoun that he would allow 2 percent discount on payment within 30 days. Calhoun argued in favor of a 10 percent discount within 90 days.
Larson said that if the plaintiff were willing to accept the $34,880,000 figure for the three plants he, Larson, would be prepared to close the deal before he was sworn in as Federal Works Administrator on Monday, June 6,1949.
*678 In this discussion Larson specifically stated that the sale by VAA at that figure was predicated upon the fume control problem at Mead being assumed by the plaintiff. Calhoun argued that because of this problem he thought that the price should be lower.
41. Calhoun, on June 8, 1949, recorded discussions had with his associates concerning the negotiations had with Larson on that day as follows:
* *
Shortly after Larson left (I forgot to add that Mr. Oscar Cox and Lloyd Cutler were both present at our meeting), Mr. Kaiser and Mr. Trefethen phoned in from New York.
I told them of my conversation with Larson. They were extremely interested in the proposal which Larson had made. Mr. Trefethen asked that I call Dusty Rhoades in Oakland and advise him of the conversation and to have Rhoades then call Trefethen in New York.
I phoned Rhoades in Oakland and reviewed the above with him. At first Rhoades was quite hesitant, stating that it was a very hard decision for him to make as to whether the $34,880,000 was a proper purchase price for us to accept. He went into the Mead control problem and also the possible value of having the long-term leases from the Government with the Government as a partner, etc., and one that we could turn to in the future in case things got rough, etc., the same as Reynolds Metals always seem to successfully be able to do.
Rhoades asked me how I felt about it, and I told him that I thought now was the time and that this was the opportune moment in which to consummate a deal.
I forgot to add that when I was discussing with Larson about a cash discount that he had stated he couldn’t give a cash discount but that he could give better terms, namely, that he could make the deal on the basis of 5 percent down and 25 years.
Rhoades finally agreed that he had always been of a mind that around a $35,000,000 purchase price for the three plants, namely, Baton Rouge, Mead and Trent-wood, was a very good figure. He said he wanted to think about it for a while and that then he would call Trefethen.
Shortly after I had finished talking to Rhoades, Trefethen called me again from New York. He wanted *679 to review again with me the figures of the proposal made verbally by Larson.
Trefethen asked me how I felt about the matter. I told bim I thought it was very opportune; and he also said that he hated to see this opportunity slip by. He said he just felt intuitively it would be the thing for us to do — to pay the purchase price as offered by Larson.
He also stated that we should try to get a cash discount for cash within 90 days, even though it was a very small percentage.
He said also he thought that we should try to get the same terms on Newark, namely, 5 per cent down, and 25 years, as Larson had offered on these three plants. He said that he had always thought if we could buy the four plants for around $40,000,000 that it would be a good try.
He said that he was flying to Oakland tonight and would be contacting the directors by telephone and would check with me. He said that he did not think it was necessary for Ehoades to come back, but if it would make Ehoades feel any better, perhaps Ehoades would want to catch the plane Sunday and come back to be here.
I pointed out that if we worked out this deal, not only would we have ownership, but we would in effect be working out approximately a $85,000,000 financing deal, namely, the purchase price left for down-payment, would in effect be financed by the Government. This I compared to the idea that if we built separate plants and turned these plants back to the Government, we would actually have to finance equity money from somewhere else.
42. On June 6, 1949, Chad Calhoun recorded as a file memorandum the activities in which he participated that day. It reads as follows:
This morning about 9:00 o’clock I went to Larson’s office at War Assets. He did not show up until about 9:30. While I waited outside I heard him send for Mr. John Joss, War Assets General Counsel, Dr. Shaffner, a War Assets Board member and economist, Irving Gumbel, and Arthur Menefee. I then called Cox and asked him to come down and join me.
It was some time after 10:00 before Larson sent for his own staff members to come into his office. Cox and I waited outside, but I did give Larson the drafts of a proposal from War Assets to us and our reply thereto.
It was about 10:35 before they sent for us. Only Larson and Admiral Mather were present at that time.
*680 Larson advised me that they had been discussing our and their ideas regarding the sale of the three aluminum plants to us and that they had decided that the matter required further analysis and study by them and that particularly they wanted to see the studies which we had underway as to our alternatives on the various plants.
Larson said that Gumbel had stated at the meeting that he would rather sell the plants at $25,000,000 if there was a good justification for it than to make a deal this morning on any kind of a figure without proper backup and justification.
I told both Larson and Admiral Mather that I was authorized to and prepared to conclude a deal on the $33,108,000 figure. That Mr. Kaiser, Mr. Trefethen, and I had worked like demons over the weekend obtaining the approval of our Board of Directors for such a figure and that we were prepared to go ahead on that basis.
Both Larson and Mather were definite in stating that they felt we should take a little more time and really discuss it out further.
I then asked Larson if they would give us a proposal, based on his verbal statement to me in our meeting of last Friday, June 3. Larson was reluctant to do so and also Mather.
It was then approaching 11:00 and Admiral Mather was due then to be sworn in at 11:00 as War Assets Administrator. Up to that moment, of course, Larson would be War Assets Administrator.
Larson then asked me if we were prepared to give them a firm proposal in writing for the $33,108,000 figure good for 60 days. I told him I had been authorized to dose the deal today for $33,108,000, but that I did not think I could give them such a proposal with a 60-day time limit. I told them that we would be willing to give them a firm proposal but that I would have to call my people regarding the time limit on it.
I told them that we had had difficulty in getting the $33,108,000 approval from our board of directors and that I did not know just how long it would stand up. I felt that since some of our people were shaky about approving it at that price, we could not be in a position ox giving too long a time limit on such a proposal.
Admiral Mather stated that, “We got the property you have the desire to buy. We want to sell. I believe in private ownership. I believe we can arrive at a deal on these plants.”
*681 We returned to my office. I called Mr. Kaiser in New York and reported the above to him. His reaction to the above was that we were making progress, and he appeared to be quite satisfied with it. I told him I was calling Mr. Trefethen to get clearance on the time limit to place on our firm proposal at the $33,108,000 figure.
I then called Mr. Trefethen in Oakland, reaching him there about 7:30 his time. He agreed with me that my suggestion of a 20-day time limit was all that we should give War Assets on a firm proposal at the $33,108,000. He also stated that he felt we were making progress.
I then switched over to D. A. Rhoades at his home at Palo Alto, California. At first Dusty did not want to make any firm offer to War Assets, but I told him that I had agreed to do so and that it would be very much to our advantage to have such a firm proposal in their hands with a qualification, of course that based upon our study we might be forced to revise it downward at the end of the 20-day period.
I told him that both Larson and Admiral Mather had said they wanted to see the studies we were having prepared as to our alternatives, and asked Dusty if he had them all ready. He stated that they were not yet completed. I was surprised at this, as ten days or more ago when he was in town they had only a few more days’ work to do on that.
He said in response to my question on this that Mene-f ee had told him that War Assets would have the Arthur Little Company review our studies, and that consequently he then wanted them to be in excellent shape; consequently, they were taking more time on it than he had originally thought.
I urged Rhoades to come back with the studies at the earliest possible moment in order that we not lose the present momentum of negotiating on these plants.
Rhoades agreed to the submitting of a firm proposal and also to the time limit of June 27.
He stated that he would plan to be back here the early part of next week with the studies. I told him then that I would so advise Admiral Mather and the other people at War Assets.
I also asked him regarding his studies wherein he capitalized the savings from the various plants to be fortified with good, sound and authoritative reasons for using ten times such savings as a means of capitalizing. Rhoades brought up the question of whether he should bring back figures showing the savings that would accrue to us if we put in a sheet rolling mill at the New *682 ark facilities. I told, him I was afraid of that right at the moment but that it would be well to bring back both figures, namely, a figure of the Trentwood alternative mill located in the East at some spot other than Newark and also the Trentwood alternative mill erected at the Newark facilities. I told him that we then could determine as we negotiated here whether it would be wise to bring in the Newark figures or not.
Mr. Kaiser called me this afternoon again. He said he had talked to George Woods; and George Woods was also in agreement to the 21 days’ time limit on the $33,108,000 figure.
43. On June 7, 1949, the plaintiff submitted its formal offer in writing to purchase the three plants for $33,108,000.
44. On June 15, 1949, a meeting was held between representatives of the plaintiff and WAA to discuss the purchase of aluminum plants. It was attended by fifteen individuals, including Henry J. Kaiser and Calhoun for the plaintiff, and Admiral Mather and his general counsel John Joss, among others. Mather was present only for a short time as he was to attend a congressional committee matter that day. He did state before leaving that the WAA had a dual responsibility to create competition in the aluminum industry and to look out for the best interest of the Government. Kaiser indicated that he was concerned that plaintiff’s $33,108,000 offer was too high. The main purpose of the meeting seemed to be for the presentation of plaintiff’s alternative course if it should be determined that it should not buy the plants. The alternatives were in general that the plaintiff would build new up-to-date plants to some extent in different locations from the plants it was considering for purchase.
45. On July 11, 1949, Chad Calhoun and D. A. Rhoades for the plaintiff conferred at WAA with Admiral Mather, John Joss, Irving Gumbel and Arthur Menefee. Plaintiff’s representatives were told that the WAA did not seriously consider the possibility that the plaintiff would build new aluminum plants as an alternative to purchase of the three plants for which it had been negotiating. Mather said that he could not accept the $33,108,000 figure offered by the plaintiff and that he could not go along on the 40 percent of acquisition costs which had been quoted to plaintiff by *683 Larson, in June. He said Larson’s $34,880,000 figure as 40 percent of acquisition costs was based upon “bareback” acquisition costs and did not include capital improvements of about $3,000,000.
Matter told Calhoun and Ehoades that his staff regarded the three plants as having an appraisal value of $49,000,000 which was too far away from the $33,108,000 figure to discuss.
Mather and his staff then suggested a sale at $5,000,000 down payment with the balance payable over 17 years in accordance with Beynolds’ long term lease formula, the plaintiff to have complete ownership at the end of the 17 years.
46. On July 13, 1949, Calhoun prepared a written memorandum of his discussions of that day regarding the aluminum plant purchase. It reads as follows:
I endeavored to reach Adm. Mather the first thing this morning, but he was not in his office (Had gone to see a doctor.).
I then called John Joss about 9:20 and told him of our position, namely, that we could not discuss the “formula” basis of aluminum plant purchase and were only interested in the straight purchase price along the lines of our proposal.
Shortly thereafter, about 9:30, Gumbel called me. He had a suggestion that we go ahead with the “formula” basis as proposed Monday by Admiral Mather but that it include an option to purchase at $49,000,000 plus interest at 4 per cent less all rentals paid.
Then ensued a long discussion in which I told Gumbel firmly and definitely we were not interested in the “formula” basis at all because of the uncertainties, etc., and the fears which our directors and other people of our company had concerning it.
We had a long discussion then as to the basis for the evaluation and on their $49,000,000 figure.
Gumbel seemed to think that we were being arbitrary in endeavoring to set a price. ■ He said that the Government had to be considerate of any “windfall” in sales. I argued quite strongly about his use of such a word and pointed out that we, as managers of the company, naturally had a sign-off point beyond which we could not go and that did not necessarily mean that we were being arbitrary at all.
I told Gumbel that perhaps they might even be right regarding their $49,000,000 figure from their standpoint *684 and we could equally be right regarding the maximum amount we felt that we could purchase the plants for. That simply if we could not make a deal that would be the end of that and we would then have to follow out some of our alternatives either going on the long-term leases or building separate plants.
I told Gumbel that he naturally had a right to bargain with us but that in his disregarding and minimizing the value of our alternatives in standing on the Baton Rouge and Mead leases and building aluminum sheet mill, that is, our alternatives, he was being very wrong and unfair, as they were very serious considerations to us.
Gumbel stated that if we made capital expenditures for new plants on our own we would be assuming great risks regarding the amount of business, etc., which would ensue in the future. I made it clear to Irving that he was absolutely right but that we had used such a factor in establishing and determining our purchase offer on the Government-owned plants and that this factor applied equally to either the purchase of the Government plants or the erection of new plants by ourselves.
At 10:25 Admiral Mather called me. I told him of my talk with Mr. Kaiser, Trefethen, and others late yesterday afternoon and of my efforts to reach him late last night and also earlier this morning. I told him of my talk with Gumbel last night and of my talk with John Joss this morning and further advised him that we were necessarily signing off on any consideration of the so-called “formula” basis of aluminum plant purchase as he had proposed to us on Monday. I told him that there were too many uncertainties involved and that our people were afraid of such a deal at all and that the only thing we could consider would be an outright purchase.
I told him that Mr. Kaiser had phoned Larson late yesterday afternoon and had raised the question as to the 40 per cent proposal which Larson and others had made verbally to us in the past. Mather then said that one thing about the 40 per cent deal was that when Larson made it to us he had neglected to include the additional value of capital improvements which had been made.
He asked me what the amount was that Larson had based the $84,880,000 figure on, and I advised him that it was a valuation of $87,200,000 on the three plants. Mather said that as he understood it, the capital improvements which had been made amounted to about $2,000,000, which would make a total of $89,200,000. He then said 40 percent of that was $36,800,000.
*685 Admiral Mather then said, “Why not look at it this way, namely, suppose we talk about a figure now of $36,800,000 with a substantial down payment and 20 years on the balance.”
I told the Admiral that that was certainly a basis for discussion, and we would look in to it. Inasmuch as the Admiral is down with a fever and is going home, he will not be available today, but he stated he would tell John Joss of his conversation with me. He said he hoped to be in the office tomorrow, but if not, that I could call him at his home, Wisconsin 6876.
■ Note. — The $36,800,000 figure mentioned by Admiral Mather over the phone was an error in computation. The figure he was using, viz., $36,800,000 was his computation of 40% of $89,200,000. Actually, the 40% of $89,200,000 is $35,680,000.
47. On July 14, 1949, the WAA by letter signed by Admiral Mather as Liquidator of War Assets, rejected the plaintiff’s offer of June 6 to purchase the three plants at $33,-108,000. The letter made a counter proposal to sell the plants with a $5,000,000 cash down payment, with a mortgage covering payments over 17 years which would have been payable under the proposed 17-year leases. The letter contained a second counter proposal covering sale of the three plants to the plaintiff for $38,250,000 with 10 percent down, with balance payable over 25 years at 4 percent. The letter reads in part as follows: ■
There remains outstanding our proposal of June 29, 1949, to lease these plants to you on a basis comparable to the terms and provisions now contained in the leases with the Keynolds Metals Company with respect to similar plants. The offer with respect to those leases expires August 28,1949, and the present proposal is not intended in any way to conflict or cut across such outstanding offer.
48. Calhoun called Larson on July 14. He asked whether Kaiser had telephoned him. Larson told Calhoun that he had been in touch with Admiral Mather and that the time seemed appropriate for the plaintiff to raise its offer and that if this were done he felt that a sale could be closed.
49. On July 15, 1949 the plaintiff by letter rejected the WAA counter proposals (contained in its letter of July 14) *686 and made a further offer to purchase at $35,000,000 which reads in part as follows:
Therefore as an extreme of what we feel we are justified in paying for these plants, but in the spirit of cooperative negotiation and a recognition of your sincerity and honest endeavors to arrive at a price which is fair likewise to the Government, we make the further absolute final proposal now subject to your acceptance before the close of business July 22, 1949, to purchase the three subject plants under the following terms and conditions:
1. Purchase price $35,000,000.
2. Upon acceptance of the offer, the parties will immediately execute a sales agreement in conformity with this offer, and upon the execution of the sales agreement, we will pay the Government 5 per cent of the purchase price and the balance of the purchase price will be paid in one-hundred equal quarterly installments with interest on the unpaid balance, payable quarterly at the rate of 4 percent per annum. We shall have the privilege of paying all or any part of the unpaid balance at any time without penalty, such prepayment to apply to the installments of principal in the order of maturity.
3. We will execute purchase money mortgages on the real and personal property conveyed, each mortgage to secure the entire unpaid balance of the purchase price of all three plants. The mortgages shall contain terms, where applicable, substantially similar to the terms of the mortgage used in the purchase of the Newark plant, and the disposal will be subject to such necessary legal requirements not inconsistent herewith as may be determined by your legal office.
4. The present leases for all three plants will terminate as of July 1, 1949, and title thereto shall be transferred as of said date.
5. The sales agreement shall be made subject to the condition that we obtain a national security clause on each plant mutually satisfactory to the Munitions Board, National Military Establishment, and to our company. We shall have a period of 120 days or such additional period as may be agreed from the date of the acceptance of this offer within which to obtain Munitions Board approval of a mutually satisfactory national security clause.
6. In the event the sale is not consummated the present leases shall remain in full force and effect.
*687 7. The sale is subject to the conveyance of title which the purchaser regards as satisfactory.
8. That you agree that in the event you secure the authorization required by you to accept payment in aluminum pig in lieu of cash under any contract covering the lease, or sale of surplus property, that we be allowed at our option to make such payments for presently accrued rentals, down payment, principal payment and interest to the extent of at least 100 million lbs. of aluminum pig.
We are confident that the importance of aluminum as a strategic and critical material in National Defense is recognized by all responsible Government officials and that they will not fail to take advantage of this opportunity to provide a substantial amount of aluminum for the national defense stockpile hi accordance with existing authorizations.
If the offer herein of $35,000,000 with the terms and conditions as stated above is satisfactory to you, will you kindly indicate your acceptance by signing and returning the enclosed copy of this letter.
50. On July 15, 1949, Calhoun prepared a memorandum of a conference held that day between himself and Rhoades for the plaintiff, and Mather, John Joss and a Captain Greenley for the WAA. It reads as follows:
Rhoades and I prepared a counterproposal to War Assets to purchase the plants for $35,000,000. We delivered it at four o’clock and had a meeting with Admiral Mather, John Joss, and a Captain Greenley.
They read the proposal through in its entirety. John Joss’s first comment was that they would want a categorical statement from us in the event they made any kind of a deal with us to the effect that we were really serious about the alternatives of constructing a rolling mill at Newark, Ohio. Also, that such a letter reemphasize the question of obsolescence, etc.
Admiral Mather stated that he wanted time to consider the proposal but that he would give me a yea or nay by the close of business Monday, (July 18).
The Admiral then stated that he did not like the 5 per cent down payment worth a damn and thought he would be in a lot better position if we could raise that to 10 per cent. To this we said nothing inasmuch as we had pointed out that our proposal was our absolutely final deal.
*688 Later the Admiral stated again that he would like to see the down payment upped even if only to ly%. We still said nothing.
Regarding the number paragraph 8 of our proposal regarding the application of aluminum pig on purchase and interest payments, the Admiral made it clear to us that the Administrator, namely, Larson, had stated that he would not accept such payments in pig unless the Munitions Board had agreed to having such pig applied against their appropriations.
I told the Admiral that we understood this, as Larson had told us the same thing. We did malee it clear, however, that what we had in mi/nd and the basis of our proposal imder paragraph 8 was that if War Assets or General Services Administration accepted payments m aluminum pig from anyone that they likewise do so with us. We told them that we did not want to be discriminated against. [Italics supplied.]
At first Mather was inclined to state that he did not know whether that would apply to a sale and might apply only to rentals due. John Joss stated that he understood the Munitions Board had approved sending over a letter to General Services Administration directing that it accept up to 60 million pounds of aluminum pig in lieu of other payments due to War Assets.
However, Admiral Mather pointed out that the Administrator, namely, Larson, had not delegated the authority under the section 204 of the General Services Administration Act to War Assets and that consequently he was handling it entirely by himself.
He stated that Larson was waiting for further authorization or direction from Munitions Board for Federal Bureau of Supply to purchase aluminum pig.
Rhoades and I again made it clear that the bases of our proposed was that if u/nder any basis they (Mowed a/nyone else, namely, Reynolds Metals, to apply ahrnii-num pig in lieu of payments, that Perma/nente would be given the same rights. [Italics supplied.]
51. On July 21,1949, WAA by Admiral Mather as Liquidator, handed to Calhoun another proposal which reads as follows:
We have considered the representations made in your letter of July 15, 1949, which concludes with a proposal to purchase the above referenced plants at an overall price of $35,000,000, payable 5% down and the balance over a period of twenty-five years with interest at the rate of 4% and subject to the condition that during the *689 life of the mortgage you be permitted to substitute in •lieu of cash aluminum pig up to 100,000,000 pounds on the basis of current market value at time of deliveries.
We recognize that there are alternatives available to your Corporation whereunder you might enter into a long term lease of the plants or proceed to implement your operating facilities through private construction. However, even though we give full merit to those alternatives we find it difficult to accept the proposed $35,000,000 as the overall principal purchase sum especially when coupled with a right to substitute aluminum pig for cash payments in the substantial amounts indicated.
We are reluctant to bring these negotiations to a close without exhausting every effort toward the end of reaching an agreement reasonably satisfactory to both your Corporation and the Government. As you are aware I personally do not have the authority over the. determination of any question involving substitution of aluminum pig for cash payments. However, I am pre-Eared to recommend to the Administrator of the General ervices Administration a formula for substitution of pig for cash provided an agreement can be reached with your Corporation as to the basis of such a formula.
Though we have not as yet received advice from the Munitions Board with respect to indicated amounts which it might consider appropriate for us to accept as strategic materials for processing to the stockpile through the operation of Section 204(e) of Public Law 152, 81st Congress, and Public Law 520, 80th Congress, it is our understanding the Board will advise us that it would be appropriate from the standpoint of current consideration of strategic and critical materials for this Agency to acquire under Section 204(e), Public Law 152, from 15,000,000 pounds to 30,000,000 pounds of aluminum metal in pig or ingot form which comply with Grade 5 of Federal specifications QQ-A-451A. On the premise that the advice of the Board will be as hereinbefore indicated I am prepared to recommend to the Administrator the acceptance of your proposal of July 15, 1949, subject to the following:
(1) That the purchase price be increased to $36,800,-000, and
(2) that condition No. 8 of your proposal be modified to read as follows: — “during the fiscal year 1950 General Services Administration will accept, in lieu of cash, payments in aluminum pig or ingot meeting the requirements of Grade 5 of federal specifications QQ-A- *690 451A up to 12,000,000 pounds of sucb material on valuations predicated on current fair market values existing at times of delivery; that to the extent the Munitions Board increases its advisory amount above 30,000,000 pounds for the fiscal year 1950, you will be entitled to make similar and additional substitutions up to approximately two-fifths of the additional amount indicated for the fiscal year 1950; and that thereafter during the term of the mortgage specified in your July 15,1949, proposal you will be entitled to substitute in lieu of cash aluminum pig or ingot of the specified grade to the extent of approximately two-fifths of the amount indicated by the Munitions Board for subsequent fiscal years.”
I notice that your proposal of July 15,1949, is subject to our acceptance before close of business July 22, 1949, and we make this letter proposal in the hope that the basic points of difference may be resolved before that time.
52. In reporting by teletype to Henry J. Kaiser and other senior officers of plaintiff, Calhoun stated that the two-fifths mentioned in WAA substitute paragraph 8 was arrived at as indicating plaintiff’s proportionate share with Beynolds based upon the relationship of plaintiff’s productive pig capacity to Beynolds’ productive pig capacity.
He also stated that upon a question raised by Calhoun to Mather and Joss as to what might be done with a proposal of $35,000,000 without any mention of payment in aluminum pig, they told him that their lowest figure was $36,556,000 since that was 40 percent of their finally determined acquisition cost of the three plants of $91,391,199.
53. On July 22, 1949, General Services, by Mather as Liquidator, in a letter of that date, made a firm offer to sell the three plants to plaintiff for $36,800,000 with condition 8 of plaintiff’s proposal of July 15 amended to read as quoted in the letter quoted in finding 51.
54. A meeting was held on July 27, 1949 beginning at 12:30 p.m. in the Washington office of the plaintiff between Mather, John Joss and McCormack (WAA chief appraiser) and Henry J. Kaiser, Edgar Kaiser, Mr. Tref ethen, executive vice president of plaintiff, Calhoun and Bobert Elliott, an assistant to Henry J. Kaiser. Luncheon was served at the long conference table. Henry J. Kaiser presided at the head *691 of the table with. Mr. Trefethen at his right and Admiral Mather at his left. The others were seated around the table with McCormack and Calhoun at the other end of the table. After luncheon had been served, in opening the discussion Mather told the group that Larson as General Services Administrator had delegated full responsibility to him in the disposal of aluminum plants. While Calhoun was engaged in discussions, which at times became heated, with McCor-mack concerning the cost of the three plants, Mather and Kaiser were concluding the negotiations which led to the sale of the plants. Henry J. Kaiser turned to Mather and asked him the price at which plaintiff could buy. Mather took a sheet of paper and wrote the figure $36,000,000. Kaiser asked if that was the lowest price at which the plants could be purchased. When Kaiser received an affirmative reply, he and Trefethen excused themselves to a corner of the room. After a short private discussion with his associates, Kaiser returned to the conference, shook hands with Mather and said “You have got yourself a deal.” Turning to those at the other end of the table, who were still engaged in a heated discussion over costs, he said “Forget all about it, boys, it is all over.” Thereafter Kaiser asked Mather for a written assurance that would protect the plaintiff from a better deal which might be made to Reynolds Metals Company. Mather consulted with John Joss who told him such assurance could be given. Joss dictated the text of such a letter. Its terms were discussed at the conference. Mather telephoned to Larson, who since July 1 had been serving as General Services Administrator and again had become Mather’s superior. He told Larson of the results of the negotiations and had Joss read the text of the letter to Larson, who approved it. The letter was signed by Mather.
After the sales agreement was signed, a press release was prepared at this meeting with the assistance of Mr. Calhoun’s staff. It announced the terms of the sale and quoted Mather as shown below:
‡ *
Terms of sale provide for a down payment of five percent and purchase money mortgage or mortgages over a period of twenty-five years at four percent interest. The purchase price of $36,000,000 represents *692 80 percent of the fair value placed on the three properties by War Assets.
Permanente had been operating the plants under lease since early 1946, with options to buy.
Near Admiral Paul L. Mather, Liquidator of War Assets, in announcing the sale, said:
“One of the principal objectives laid down by the Congress in the disposal of surplus property from the last war was to foster the development of new independent, enterprises and to promote competition in industry.
“This disposal firmly establishes Permanente Metals Corporation as an independent operator in the aluminum industry.
“The sale also is in accordance with the policy of the Government to make final disposal of its interest in wartime plants, and is subject to such National Security Clauses as the Munitions Board may prescribe.”
‡ ‡ ‡ $
55. Mather’s letter of July 22 was signed by Henry J. Kaiser and Mather and used as the sales agreement. The figure $36,800,000 was lined through and the figure $36,000,-000 inserted and the change was initialed by Mather and Kaiser.
56. The letter signed by Mather at the conference of July 27 which the plaintiff characterizes as the “most favored nations” letter and which the defendant calls the “side letter”, hereafter referred to as the letter of July 27, reads as follows:
GENERAL SERVICES ADMINISTRATION
WAR ASSETS
WASHINGTON, D.C.
July 27, 1949
Mr. Henry J. Kaiser
President
The Permanente Metals Corporation
1200 18th St. N.W.
Washington 6, D.C.
Ke: Purchase of:
Plancor 226-40, Baton Rouge Alumina Plant
Plancor 226-S, Mead Aluminum Reduction Plant
*693 Plancors 524 & 1061, Trentwood Aluminum Boiling Mill
Dear Me. Kaisee :
It is understood that the War Assets will not offer the same type of plants to Beynolds Metals or others on a more favorable basis. In the event that circumstances now unforseen result in a more favorable disposal, of such plants Permanente shall receive corresponding treatment and the disposal documents and obligations and rights therein contained for these three plants (Baton Bouge, Mead, and Trentwood) will be modified and adjusted accordingly,
very truly yours,
(S) Paul L. Mather
Paul L. Mather,
Bear Admiral, U.S.N. (Retired) Liquidator.
57. After discussion between John Joss and a Minton Holland of the legal staff of War Assets, a further letter was signed by Mather and sent on July 29 to the plaintiff which reads as follows:
Bef erence is made to this Administration’s letter dated July 27, 1949, with respect to the above captioned plancors.
It is understood that the reference made in said letter to “same type of plants” shall mean the sale of any one or more of the following plants:
Hurricane Creek Alumina Plant, Plancor 226-X;
Jones Mill [sic] Beduction Plant, Plancor 226-K;
Troutdale Beduction Plant, Plancor 226-0; and
McCook Bolling Mill, Plancor 652.
58. The letter agreement for the sale of the plants was executed on the same day. The effective date of the sale was July 1,1949. In general, the agreement provided for a purchase price of $36,000,000 for the property Kaiser was leasing, a 5 percent down payment with the balance payable in equal quarterly installments over a period of 25 years. Interest was 4 percent per annum and a provision was included covering payment in aluminum pig. No mention of Bey-nolds or the July 27th letter was included in the five-page agreement.
59. In a letter to Calhoun on October 3, 1949, relating to payments in pig, Mather stated:
*694 Contemporaneously, I am pleased to confirm that my letter to you, dated July 27,1949, as clarified by my letter dated July 29, 1949, concerning the effect upon tbe present sale of future sales of similar plants by this Administration to others, remains in full force and effect.
Calhoun acknowledged this statement in his response of October 12. Similar language was included in a letter of Mather’s relating to the execution of the final sales documents on October 18,1949.
60. The $36,000,000 sales price was a negotiated figure which was not based upon any formula. Larson felt that a price around $35,000,000 was realistic. Both Larson and Mather considered the negotiations of this sale to have been a “horse trade.” Similarly, the Kaiser representatives based their offers on the value of the plants to the company. No agreement has ever been reached between the Government and Kaiser as to the correct acquisition cost figure for the three Kaiser plants.

Reynolds Sales Negotiations

61. Soon after the Kaiser sale was consummated, Keynolds reopened its purchase negotiations. From the outset, both sides realized that the War Assets policy of equal treatment and the practice which had developed during the lease period demanded that any sale to Keynolds be comparable with the one made to Kaiser. Thus, the skeleton of the Kaiser transaction, 25 years to pay, 4 percent interest, 5 percent down payment, and acceptance of payments in aluminum pig, was adopted immediately. However, the negotiators differed on the method of selecting a comparable price, as each devised a formula which would yield the best result for its side. Keynolds advanced the unit-of-capacity basis in early October, offering $45,000,000; War Assets countered with the percentage of acquisition cost basis in early November, thereby justifying a price of $48,500,000 plus additional recovery on facilities which were not included in the Kaiser sale.
As the negotiators argued about these methods of overall comparison, they attempted to settle several problems for which the Kaiser sale furnished no guides. Among these *695 were the price of the additional facilities, notably a sinter plant at Hurricane Creek and a power plant at Jones Mills; the outstanding contracts for the rehabilitation of Jones Mills and the installation of fume control equipment at Troutdale; and the financial problem created by Reynolds’ desire to have the sale made to a subsidiary. Marginal problems of comparability arose around the question of the effective date of the sale and the return of the extra rental which Reynolds had paid because of its long term leases.
Because of the constant reference to the Kaiser sale, and the unique problems of the Reynolds plants, the Reynolds negotiations did not move along the same clear line of price compromise shown in the Kaiser negotiations. On the contrary, the difficult negotiations dealt with several problems simultaneously and, therefore, cannot be accurately described by a chronological listing. The theme that the final sale must not favor either Kaiser or Reynolds was stressed by the War Assets negotiators constantly; and in their effort to force the highest “comparable” price out of Reynolds, they alluded to the July 27th letter as a statement of their responsibility. By November 23, agreement on the major points in the sale had been reached as Reynolds accepted the price based upon the acquisition cost basis. On December 21, the agreement was closed. The following is a detailed statement of the course and major problems in the negotiations.
62. The day after the Kaiser sale, Mather wrote Richard Reynolds, Jr., President of Reynolds, and outlined the terms of the Kaiser sale, asking if Reynolds would like to negotiate for a similar purchase of the four Reynolds plants.
63. Mr. Reynolds replied that he would have to consult with his financial advisors to ascertain whether Reynolds was in a position to purchase. Soon afterwards, he advised Mather that he was willing to begin negotiations.
64. Mather was in charge of the Reynolds’ negotiations for War Assets and participated in many of the important conferences. Larson acted in an advisory capacity and was kept informed but did not actively participate. Most of the negotiations were carried on by Joss, assisted by Holland *696 and frequently by Walter Day of the Credit and Finance Division of the GSA Comptroller’s Office.
65. On August 2, 1949, the first negotiating meeting was held with Reynolds’ representatives. Mr. [Reynolds stated that a purchase would be to the interests of his company but that it would not be practical to increase its present liabilities at that time. The possibility of organizing a subsidiary company which would purchase the plants was explored.
66. Marion Caskie, executive vice president of [Reynolds, and Woodson Houghton, Reynolds’ Washington counsel, handled the negotiations for Reynolds. Richard Reynolds, Jr. attended some of the conferences.
67. Negotiation meetings took place through August and September. On October 5,1949, a major meeting was held in Mather’s office. The Reynolds negotiators presented a memorandum comparing the Reynolds’ plants and the PSr-manente plants on a unit-of-capacity basis. On that basis, they found that a comparable sale would be made at $45,000,000.
For bargaining purposes, Joss and Mather were using a fair value figure of $55,000,000 as the purchase price of the plants.
68. At one point in the meeting, Richard Reynolds and Mather tentatively agreed on a purchase price of $48,000,000. However, when the Reynolds’ representatives indicated that they considered the completion of all Government contracts in existence at that time to be part of the $48,000,000 purchase price as well as all of the property, the War Assets staff members disagreed and the transaction was not completed. The contracts which were in existence were those relating to the installation of fume controls at the Troutdale plant and the rehabilitation of pot lines at the Jones Mills plant.
69. Thereafter, with the exception of a period early in November when Joss was out of the city, purchase discussions took place two or three times a week. Caskie and Houghton made constant reference to the Kaiser purchase in these conferences and they stressed the unit-of-capacity comparison.
*697 70. In a memorandum of October 26 and orally about the same time, McCormack advised Mather that the unit-of-capacity basis would be unduly favorable to Reynolds because there was more value per unit of capacity in the Reynolds’ plants than in the Kaiser. He recommended that the sales be made equalized on the basis of value. He also informed Mather that a sale on a percentage of cost basis would favor Kaiser if it favored either party because the value of the plants in relation to costs was higher for the Kaiser plants.
71. The Reynolds’ request that the sale be made to a subsidiary complicated and delayed the negotiations. Day participated in the negotiations actively because of the problems created by this request. He also devised a payment schedule for Reynolds which provided for an average yearly payment, irrespective of the ratio of principal to interest. A meeting held on October 26 concerned these financial problems. After the meeting, Day recommended that the $45,-000,000 offer be rejected and a counteroffer of $48,500,000 be made.
72. Early in November, Joss and Holland computed the percentage of acquisition costs which Kaiser had paid to be 39.39 percent. They then determined that the application of this percentage to the Reynolds’ acquisition costs would provide a means of getting Reynolds to raise its price.
73. When the 39.39 percent was used by Joss to support a purchase price of approximately $48,500,000 without settlement of the outside contracts, the Reynolds’ representatives complained bitterly that a sale on such a basis was unfair to them. Caskie stated that Reynolds was being forced to purchase excess capacity at Hurricane Creek, an $11,-000,000 power plant at Jones Mills, and an $11,000,000 sinter plant at Hurricane Creek that Kaiser had not purchased. The Government negotiators were accused of being prejudiced in favor of Kaiser.
74. The July 27th letter was used by Joss and Holland as a means of imposing the price reached through the use of a percentage of cost upon Reynolds. The Reynolds’ representatives accused Joss of strait-jacketing their negotiations and prolonging the discussions by his arbitrary stand *698 on tlie acquisition cost basis. The 39.39 percent formula was devised solely as a means of forcing the Reynolds’ price up.
75. The costs used by Joss and Holland for a computation of the price which they presented to the Reynolds’ representatives were furnished to them by Benjamin Coplan of the Appraisal Division. Coplan formally set down these figures in a memorandum on November 10,1949. The treatment of the costs relating to the fume control and rehabilitation contracts was left open for the negotiators to handle. Upon request Coplan furnished the negotiators with separate figures for the sinter plant at Hurricane Creek and the power plant at Jones Mills when separate treatment of these facilities was being discussed because like facilities had not been sold to Kaiser.
76. Ultimately, only the sinter plant at Hurricane Creek was separated for special treatment as a result of the November discussions. Sintering is a process by which the low grade domestic ore used at Hurricane Creek is refined. Kaiser did not lease or purchase the sinter plant at Baton Rouge because of the accessibility of high grade foreign ores by means of water transport. Because of the expected short supply of domestic bauxite available to Reynolds, it was agreed that the Hurricane Creek sinter plant would be sold at a formula relating to the useful value of the plant in regard to the available bauxite. This led to a formula determination that 17.7255 percent of the cost of the sinter plant would be included in the sale price; Further recovery at 20 cents per ton of bauxite processed after a certain tonnage was agreed to by Reynolds with the condition that it be given a right to liquidate this obligation by a lump sum payment.
77. There was very little discussion of what comprised the costs for the Reynolds’ plants used by Joss and Holland. At one point, Houghton had asked whether the cost of a stop-gap fume control system which had been installed at Troutdale was included in the costs. He argued that only a small part of it would be used in the new fume control system and that it was properly considered a rehabilitation expense rather than a capital improvement. After consulting with Grumbel and Coplan, the War Assets representatives agreed and sub *699 tracted $355,528 from the acquisition costs presented by Coplan on November 10.
78. On the other hand, a great deal of discussion took place throughout the entire negotiation period regarding the settlement of the contract to install fume control equipment at Troutdale and the indemnity for fume damage claims given Reynolds under the lease.
The Reynolds’ representatives argued that the Government was installing the equipment at its expense to protect its own interest; that it would add nothing to the productive capacity of the plants; that it would be expensive to operate; and they noted the damage claims and injunction litigation which had taken place because of the fume problem. A continuation of the indemnity provision was discussed but not resolved prior to the introduction of the 39.39 percent basis in early November. In the middle of November, it was tentatively agreed that the $2,150,000 estimated expenditure for fume controls be considered a capital addition to the plant and added to the acquisition costs.
79. The 17-year extension of the leases which Reynolds entered into in the spring of 1949 had the effect of increasing Reynolds’ rent. Since Kaiser had not entered into the long term leases, Caskie argued that Reynolds was entitled to a credit of $694,028.94, the amount it had paid as additional rent prior to July 1 because of the lease extension, if War Assets insisted upon the acquisition cost basis. Joss and Mather agreed that such a credit would be equitable in that it would place Reynolds and Kaiser in the same position and Mather recommended that the credit be allowed. Larson objected and, despite Caskie’s protests, the credit was not given.
80. The Government representatives readily agreed to complete the rehabilitation contract for two pot lines at Jones Mills because all of the Kaiser lines and the other Reynolds’ lines had been rehabilitated previously.
81. On November 25, Mather summarized the tentative terms which had been agreed upon in conference up to that date in a memorandum to Larson. He described the 39.39 percent of acquisition costs formula, the capitalization of the cost of the fume control system, the $694,000 rental ad *700 justment, the sinter plant terms, the completion of the rehabilitation of Jones Mills, the effective date of July 1,1949, a continuation of the fume indemnity provision, payments in pig, and the financial considerations. Mather concluded that many details remained to be ironed out but that if Larson approved, the negotiations would move to completion. The suggested sales price was $49,648,364.24 plus the additional bauxite recovery.
Mather compared his proposed terms with those given to Kaiser throughout the memorandum. He stated in regard to the provisions giving the same effective date to Keynolds as was given to Kaiser, “This would be in line with our policy of treating both Permanente and Keynolds equally so that one will not gain a competitive advantage.” He noted that the special sinter plant treatment could be justified by reference to the undesirable power situation at Jones Mills.
No mention of the letter of July 27th was made in the memorandum.
82. Larson questioned several of the proposed terms, realizing from his lease experience that he would be confronted with complaints from Kaiser if the Keynolds’ terms differed from the Kaiser sale. He did not consider the letter of July 27th pertinent to the detailed provisions of the sales but rather to the overall competitive position of the two firms. Larson vetoed the rental credit but the other provisions found approval and eventually were incorporated into the sales contract.
83. On December 15, 1949, Mather sent Keynolds a letter agreement calling for a sales price of $50,081,958 which was accepted on December 21, 1949. The pertinent provisions of the letter agreement are set forth in the discussion of plaintiff’s claim. Later, Keynolds paid an additional $737,-979.72 to eliminate the bauxite clause which made the total sales price $50,819,937.72.

Comparison of Kaisen and Reynolds' Sales

84. Because of the marked differences between the individual plants, and the different facilities purchased, a point-by-point comparison of them is impossible. Keynolds purchased two aluminum reduction plants to Kaiser’s one, and *701 excess carbon baking facilities, a sinter plant, an aluminum fluoride plant, a synthetic cryolite plant, and a power plant which Kaiser did not purchase. In addition, the Reynolds’ disposal contained problems of bauxite reserves and settlement of outstanding contracts which were not present in the Kaiser disposal.
85. There were several methods by which "War Assets negotiators could have found a price for the Reynolds’ plants which was roughly comparable to that charged for the Kaiser plants. The unit-of-capacity basis would have favored Reynolds because of the higher cost of its plants in relation to their effective capacity. The most accurate correlation would have been obtained if the values of the plants had been compared under appraisal methods rather than through the use of a formula. Because the Kaiser plants had a higher value in relation to their cost than the Reynolds’ plants, the sale of the Reynolds’ plants at a percentage of original cost was the basis most favorable to Kaiser. The percentage of cost basis has little relation to the actual value of the plants. In the light of all the evidence, with one substantial exception, backdating,[18] the sale of the four Reynolds’ plants for approximately $50,800,000 cannot be considered to have been made on a more favorable basis or have resulted in a more favorable disposal to Reynolds than the sale of the three Kaiser plants which was made to Kaiser for $36,000,000.
86. The War Assets’ personnel made a good faith effort to keep the disposal comparable under their general policy of equality of treatment and the establishment of a competitive aluminum industry, with the exception of the backdating item.

Kaiser Claims

87. On December 21,1949, Larson called Calhoun and told him of the Reynolds’ closing, describing the sinter plant treatment and the sale to a subsidiary of Reynolds as variations from the Kaiser sale and offering Kaiser the subsidiary arrangement if it desired it.
88. After they reviewed the Reynolds’ sale contract, the Kaiser representatives requested that they be given the same *702 type of payments schedule that was given to Reynolds. J oss replied that it seemed fair in principle to give Kaiser the same schedule. However, Kaiser advised J oss on March 2, 1950, that it would submit along with its request for the revised payment schedule further requests for adjustments of its purchase documents, “Pursuant to the terms of our letter of understanding.” Joss replied on March 16 that Kaiser’s request for modifications should be handled on the basis of one overall proposal.
89. On August 25, 1950, Calhoun wrote GSA that Kaiser felt that the sale to Reynolds was more favorable than the sale to Kaiser in a number of respects and that as soon as the problems of the aluminum plant expansion program were resolved, Kaiser management and attorneys could begin discussing modifications of their sale under the “most favored nations” commitment.
90. On January 4, 1951, Calhoun sent GSA a memorandum setting forth the particular respects in which Kaiser felt the Reynolds sale was more favorable. The points listed were summarized as:
Change in Effective Date
Reduced price of Mead Sixth Line
Need for Fume Control Equipment at Mead
Carbon Furnace Deficiency at Mead
Baton Rouge Rehabilitation Expense
Mead Sixth Potline Rehabilitation Expense
91. On May 4,1951, the Kaiser claim was revised slightly and a fuller presentation was made through a memorandum and exhibits. Since Kaiser had discharged the mortgages on the plants prior to the time the claim was filed, the change in the payment schedule was not pressed. The fume control claim was revised by later letters.
92. Plaintiff’s demands were rejected on April 29,1952, by a letter from Larson. The letter stated that it was obvious that identical sales were impossible and that the letter of July 27th assumed that the overall competitive position of Kaiser would not be prejudiced by the Reynolds’ sale. Larson concluded that since he could not make a determination that the terms of the Reynolds’ sale gave Reynolds a better competitive position, Kaiser’s claim was denied in its entirety.
*703 93. The original petition herein was filed on March 9,1954. The amended petition was filed on October 25, 1954. It claimed damages for the following items:
(1) For greater reduction in Eeynolds’ contract purchase price by backdating sale and waiving rental * * *.
(2) For waiver of interest from Eeynolds on amounts credited against the down payment under the Eeynolds’ sale contract * * *.
(3) For failure to defray 60.61 percent of the cost of fume control equipment at the Mead Plant and for failure to indemnify Kaiser for payments of claims for fume damages * * *.
(4) For failure to defray 60.61 percent of the capital expenditures necessary to make Mead Plant a complete self-contained industrial entity * * *.
(5) For reduction of Eeynolds’ purchase price by crediting cost of rehabilitation done after effective date of sale * * *.
(6) For sale to Eeynolds at a lower percentage of acquisition costs to the United States * * *.
Claim No. 5 has been abandoned. The remaining claims and subsequent modifications of them will be discussed in the following findings.

A. Backdating

94. The Kaiser agreement was reached on July 29, 1949, and the sale was made effective July 1, 1949. The following provisions of the Kaiser sales contract are pertinent to this claim:
(1) The purchase price is Thirty-Six Million Dollars ($36,000,000.00). One Million Eight Hundred Thousand Dollars ($1,800,000.00), representing 5% of the purchase price, shall be payable on the execution of this agreement, together with interest from July 1, 1949, to date of payment. The remainder of the purchase price shall be payable in one hundred (100) equal quarter-annual installments over a period of twenty-five (25) years, together with four per cent (4%) interest pea* annum on the unpaid balance, also payable quarter-annually. The first quarter-annual installments of principal and interest shall be payable on October 1, 1949.
*****
(3) Title to the plants will be conveyed by quitclaim deed or deeds and bill or bills of sale, effective as of *704 July 1,1949, and purchaser will execute a simultaneous purchase money mortgage or mortgages on the real property and personal property to secure payment of the unpaid balance. Each such mortgage shall secure the entire unpaid balance of the purchase price of all three Plants.
(4) Delivery of the deeds and purchase money shall supersede and cancel the present leases of the Plants between Seller and Purchaser as of July 1, 1949, but shall in no way affect any rights or obligations of Seller or Purchaser under said leases which existed and remained unsatisfied before said date.
$ $ $ $ $
(11) Purchaser will be responsible for all insurance coverage, taxes, maintenance costs, and other expenses incurred in connection with the captioned properties applying to the period from and after July 1,1949. If any of the property be injured or destroyed by fire or other cause after July 1, 1949, and before the full purchase price shall have been paid, such injury or destruction shall not affect this agreement but the full purchase price shall be paid irrespective thereof.
$ $ ‡ $
95. On August 10,1949, a War Assets staff memorandum prepared by Menefee which listed points for consideration in the Reynolds’ sale, stated in part:
7. If the negotiations do not drag out too long, it might be advisable (certainly consistent) to arrange the date of sale retrocative to July 1, 1949, the same as the Permanente sale.
96. In the November discussions, Caskie argued that War Assets had taken an arbitrary stand on the price of the plants which had delayed the disposal and asked for the same effective date as Kaiser had received. Joss and Holland agreed that the same effective date was necessary to keep the sales comparable. Mather recommended that July 1 be used as the effective date of the Reynolds’ sale in his November 28 memorandum to Larson stating that it was necessary to keep the competitors equal.
97. The Reynolds’ purchase agreement was reached on December 21,1949. Paragraph 1 stated:
(1) The aggregate purchase price is Fifty Million Eighty-One Thousand Nine Hundred Fifty-Eight Dol *705 lars ($50,081,958.00). Two Million Five Hundred Eighty-One Thousand Nine Hundred Fifty-Eight Dollars ($2,581,958.00), shall be payable on the execution of this agreement together with interest at the rate of four percent (4%) from July 1, 1949, to date of payment; amounts of rental paid by purchaser for the period beginning July 1, 1949, which are to be credited on the down payment shall not bear interest. The balance of the purchase price, Forty-Seven Million Five Hundred Thousand Dollars ($47,500,000.00), shall be payable in annual installments as follows: * * * together with interest at the rate of four per cent per annum on all unpaid balance payable annually.
Paragraphs 4, 5 and 12’ of the Reynolds’ agreement were identical to paragraphs 3, 4, and 11 of the Kaiser agreement quoted in Finding 94. Considering the complexity of the transaction, the sale was negotiated in a speedy manner. The period from July 28 to November 21 was not an unusually long time for the negotiation of a sale of this magnitude.
98. The use of the July 1 effective date in the Kaiser sale had the effect of canceling the rent which had accrued on the Kaiser plants from July 1 to July 27. These rentals amounted to $249,345.71.
99. The use of the July 1 effective date in the Reynolds’ sale had the effect of canceling the rent which had accrued on the Reynolds’ plants from July 1 to December 21. These rentals amounted to $1,921,631.01.
100. The interest paid by Kaiser on its purchase price for the 27-day period from July 1 to July 27, computed at 4 per cent is $106,520.55.
101. The interest paid by Reynolds on its purchase price for the 174-day period from July 1 to December 21, also computed at 4 percent, is $954,986.82.
102. The treatment given Reynolds under the backdating item by the selection of a retroactive effective sales date resulted in an advantage to that firm beyond that given the plaintiff.
103. If the Kaiser sale had been backdated 174 days to February 4, 1949 rents totaling $1,842,348.54 on the three Kaiser plants would have been canceled. Kaiser claims the difference between this amount and the amount actually canceled, $249,345.71, or $1,593,002.83 as damages. In the alter *706 native, Kaiser claims tlie difference between the Reynolds’ rent canceled and the Kaiser rent canceled or $1,672,285.30.

Interest

104. The interest charged to Reynolds on the down payment for the four Reynolds plants was computed on the basis that all payments of rentals by Reynolds after July 1, 1949 had been made on that date. Actually, Reynolds made such rental payments periodically through the period July 1 to December 21, 1949. Nevertheless, Reynolds was charged interest on the amount of the down payment minus the total amount of rents paid by Reynolds during this entire period.
105. Plaintiff was charged interest on the amount of its down payment minus only the rents for the 27-day period July 1 to July 27,1949.
106. Had Reynolds been charged interest on a monthly basis between July and December 21, 1949 on the difference between the amount of the down payment minus the total amount of rents prior to each particular month, the interest it would have paid would have been $29,201.81.
107. During this period Reynolds actually paid interest in the amount of $19,399.23 on the down payment.

Fwme Control

108. The Reynolds’ contract contains the following provisions which relate to this claim:
% ifc
(22) Seller agrees to complete the installation of the fume control equipment at the Troutdale Aluminum Reduction Plant in accordance with the terms of the contract between Seller and Reynolds Metals Company dated as of May 25, 1949. However, in the event the cost of the services mider said contract exceeds the amount of Two Million One Hundred Fifty Thousand Dollars ($2,150,000.00), Reynolds Metals Company agrees to claim reimbursement of such excess over said amount of Two Million One Hundred Fifty Thousand Dollars ($2,150,000.00) as may be approved by Seller, only to the extent of sixty and sixty-one hundredths percent (60.61%) thereof.
(23) Seller will continue to indemnify and save the Purchaser and Reynolds Metals Company harmless *707 from and against any and all claims, damages and liability which may be asserted by adjacent or nearby property owners by reason of noxious or poisonous fumes, gases, vapors or solids arising from the operation of the Troutdale Aluminum Seduction Plant up to the time of completion of the installation of the fume control equipment but not after December 31, 1950.
(24) If within a period of three years following completion of the installation of the fume control equipment at the Troutdale Aluminum' Seduction Plant, but not later than December 31, 1953, the operation of said plant is required to be discontinued by an order of a Court of competent jurisdiction, Purchaser shall have the option to reconvey said plant to Seller whereupon Purchaser shall receive a credit on account of its obligation to Seller in the amount of the unpaid balance, less any delinquent installments of principal and/or payments of interest, due Seller on account of the purchase of the said Troutdale Plant (the purchase price of which is 39.39% of acquisition cost).
109. Seduction plants, such as Mead, Troutdale, and Jones Mills, utilize an electrolytic process for reducing alumina to aluminum. In this process, flourine gases are generated which are potentially injurious to animal and plant life. Injury to animal life is caused both by the inhalation of the gases and also due to ingestion by the animals, particularly cattle, of vegetation which has been contaminated by the gases.
110. The topography, climate, and agricultural economy of the area surrounding the reduction plant are important factors in determining the extent of the fume problem which arises. Troutdale is located in a rich agricultural area. Dairy farms and plant nurseries are near the plant. In contrast, Jones Mills and Mead are located in dry, timbered areas with no nearby commercial agriculture. A serious fume problem developed during the wartime operation of the Troutdale plant. In this period approximately $150,000 worth of claims were paid for flourine damage to plants and animals caused by the plant. No fume problem arose at Mead or at Jones Mills during the wartime period.
111. Pursuant to its obligation to put the plant in operating condition, the Government paid for the installation of a rudimentary fume control system costing a total of $355,- *708 528.00 at Troutdale, which has been referred to by the parties as the “stop-gap” fume control system. The system consisted of water sprays which sprayed the fumes as they rose by natural ventilation through the roof monitor of the building. Reynolds installed this equipment before it began operation of any of the pot lines. In addition, a series of fume control stations were located in the area surrounding the plant to sample the degree of flourine contamination which developed.
112. The stop-gap fume control system was ineffective and further claims arose after Reynolds reopened the plant. On June 7, 1948, a suit for an injunction against the continued operation of the plant and for treble damages totaling $1,500,000 was filed against Reynolds for injuries to dairy cattle and gladioli.
113. Immediate action was taken at War Assets to determine the best interests of the Government in the resolution of the Troutdale fume problem. On July 21, 1948, Larson wrote the Secretary of Commerce requesting information as to the effect that the closing of Troutdale would have upon the general economy and the defense program. He expressed reluctance to exercise the right to cancel the lease of the plant. On July 27,1948, Reynolds was requested to furnish data on the fume problem and was advised that WAA was studying methods of abating it. Professor L. M. Massey of Cornell was employed to investigate the damage to plant life in the Troutdale area and an expert from the Department of Agriculture was assigned to study injury to neighboring animal life. The Department of Justice was requested to aid in defending against the damage claims. Larson made a personal visit to Troutdale to assess the situation.
114. On August 18,1948, the United States filed its Representation of Interest in the suit against Reynolds, supported by an affidavit of Larson and data gathered by Gumbel. The possible liability of the United States, its loss of revenue, and the effect of a closing upon the economy were stressed in the affidavit.
115. By September 1948, Reynolds had completed a preliminary design of an improved fume control system and submitted an estimate of $1,968,624 as its cost. After inves *709 tigating the situation, the WAA staff had recommended in the summer of 1948 that an improved system be installed at Troutdale to assure the continued operation of the plant and eliminate the chance of damage claims. Thereafter, Larson requested a special appropriation from the 81st Congress to cover the cost of the proposed system during the fiscal year 1949.
116. On March 81, 1949, Larson formally approved the expenditure of $2,150,000 for fume control equipment at Troutdale. The letter of intent to Reynolds was issued on May 25, 1949, and the- formal contract for the installation of the equipment was executed on June 20,1949.
117. The contract provided that Reynolds would install roof and tower scrubbers, dust collection equipment, and hood all pots. The contract further stated:
‡ if: ‡ ‡ ‡
2. As full consideration for the performance of this contract, Contractor shall be paid or reimbursed for the actual net cost of the Services as hereinbefore or hereinafter defined, which said cost is estimated to be $2,-150,000. In the event that costs exceed the above estimate, the Government may, at its discretion, authorize such additional expenditures as may be necessary to complete the services contemplated hereunder. It is further understood that Contractor’s obligation to perform services under this contract shall not exceed the amount of $2,150,000 allowed for reimbursement or such supplemental amounts as shall later be agreed upon. Contractor’s obligation hereunder shall be without prejudice to Contractor’s right of indemnification with respect to adjacent or nearby property owners as set forth in the lease, as amended, between the Government and Contractor covering this plant.
*****
7. It is fully understood and agreed between the Government and Contractor that the Government’s position with respect to its rights and privileges of cancellation under the terms of the existing lease, as amended, covering this plant shall not be pre]udiced by the execution of this contract and that in the event of unforeseen changes or conditions it shall be the right of the Government to stop all expenditures following written notice to Contractor.
The Government and Contractor agree that the exist *710 ing lease, as amended, covering this plant will be further amended to provide that upon completion of the Services an amount equal to one-half of all amounts paid or reimbursed to Contractor hereunder shall be added to the value of the plant for rental purposes in accordance with the terms of the existing lease, as amended, covering this plant. It is further agreed, however, between the Government and Contractor that when the amount so added to the value of the plant for such rental purposes shall be amortized by Contractor, as lessee, by the payment of additional rent as a result of the increase of the value of the plant, such amount shall be removed from the value of the plant for rental purposes.
$ ‡ $ 3* $
The contract contained a termination clause allowing the Government to terminate the contract at any time, the contractor to terminate upon 60 days notice, and the settlement of the contractor’s claims and demands.
118. Installation of the Troutdale fume control system began on June 8,1949. Although the extensive preparation and planning for the project were nearly completed, little actual construction had been accomplished by July 1949. Bids were being received by Reynolds for various phases of the project at that time.
119. By November 29,1949, $1,322,741 had been committed for the Troutdale fume contract. The overall construction program was 3 percent complete at that time. By January 1, 1950 the actual installation was scheduled to be 20 percent complete.
120. Very little of the stop-gap fume control system at Troutdale was incorporated into the permanent system. The stop-gap system was completely dismantled. Only the wells were employed in the new system and some of the mechanical parts were used in other applications.
121. The permanent fume control system at Troutdale was installed at a total cost of $2,127,460.22. The defendant paid 60.61 percent, and Reynolds paid 39.39 percent of this amount.
122. Kaiser officials were aware of the fume problem at Troutdale, the frequent claims and litigation which it aroused, and the WAA agreement to pay for the installation of the permanent fume control system.
*711 123. At Mead, the wartime absence of fume complaints continued during the early lease period. However, the increased public awareness of fume damage in the Pacific Northwest, aroused largely by the notoriety of the Troutdale difficulties, and evidence of injury to vegetation which could have been caused by fluorine fumes, caused attention to be directed at Mead as a possible source of contamination. The gradual urbanization of the plant area also increased the likelihood of fume damage claims. No fume damage problem has ever developed at Jones Mills.
124. On July 14, 1948, State, local and college officials from Washington and Oregon, including a number of scientists, met in Vancouver, Washington, to consider fume damage caused by aluminum reduction plants in the northwest. The participants in the meeting recommended that the aluminum companies be urged to cooperate by paying back damages and by controlling the fumes at their source. They further recommended that WAA be brought into the discussions with the aluminum companies about the problem. The report further stated:
If cooperation fails, then pressure groups should be formed to approach the legislative interim committee to get assistance * * * Also the legislature should be approached to pass a law requiring the industry to cease evolution of fluorine compounds or close down. Police action would be necessary.
This report was later sent to Mr. Norman L. Krey, works manager at the Mead plant, by Vice Director Buchanan of the Institute of Agricultural Sciences of Washington State College in Pullman, Washington.
125. As a result of the emergence of substantial public concern over Mead fumes, in July 1948 plaintiff hired a Mr. Thomas, a trained chemist, to study and make recommendations concerning the fume problem at Mead.
126. On August 2, 1948 Director Pearl of the Institute of Technology at Washington State College informed plaintiff that the College’s regents had ordered a study of damage to vegetation and cattle allegedly caused by fumes from Mead and other aluminum reduction plants in Washington. Pearl invited Krey to attend a meeting on the fluoride fume problem in Portland the following month.
*712 On August 25, 1948 plaintiff received a formal written complaint from a Mr. Mann for alleged fume damage to Ms gladioli. Mann’s flowers were 2.8 miles east of Mead. Plaintiff subsequently settled this claim for $2,000.
On September 24, 1948 scientists from Washington and Oregon met in Portland, Oregon to discuss the problem of aluminum reduction plant fumes in the Northwest. Mr. Krey attended on behalf of the plaintiff.
At that meeting the state, local and college officials agreed that the fluorine gases from the reduction plants were damaging nearby livestock and vegetation. They concluded that the only way to prevent fume damage was to control the fumes at their source, i.e., at the plants themselves. The meeting convinced Krey that plaintiff would have to install a fume control system at Mead.
127. On November 3,1948 plaintiff’s head chemist, Byrns, informed its vice president, Rhoades, that the fume problem at Mead would become acute in the near future because of pressure from the public and that plaintiff would then have to install a fume control system there.
128. In December 1948 plaintiff constructed and commenced operation of a fume control pilot plant at Mead and hired an additional employee to run it. From December 1948 on, Mead’s cMef engineer Gunderson worked steadily on plans for a fume control system.
129. On May 20, 1949 Ford of the Spokane Chamber of Commerce had a meeting with Larson in Washington, D.C. to complain about the fume situation at Mead. After their discussions, Larson called Calhoun, informed him of the foregoing and asked Calhoun to arrange a meeting with Rhoades on the Mead fume problem.
130. On May 24,1949 Calhoun and Rhoades met with Larson in Washington, D.C. to discuss the Mead fume situation. Calhoun stated that if the problem became too acute, plaintiff would cancel its Mead lease. Calhoun told Larson that defendant had a landlord’s obligation to keep Mead from damaging the community.
131. On June 3, 1949 Larson sent the following memorandum to Mather:
*713 I have spent a couple of hours this afternoon with Mr. Chad Calhoun, again discussing the possibility of Permanente Metals purchasing the three remaining aluminum facilities they are now leasing. I told him that I would seriously consider a proposition which would bring to the Government 40 per cent of the acquisition cost of these plants and the terms would be ten per cent down and 20 years at 4 per cent interest. However, I would even liberalize these terms in order to complete this sale. This would call for a purchase price of approximately $34,800,000. You will recall that they offered us $33,000,000 plus for four plants.
The reason I have arbitrarily hit on the 40 per cent of the acquisition cost figure is that I am firmly of the opinion that we are in for some stiff competition in the aluminum business. As a result, I know that these companies now leasing aluminum plants will be making repeated requests of the Government to adjust ana amend the rental terms and other provisions of the present leases.
Another strong factor which has entered into my decision in this matter has been the danger of fume damage, which, you know, has reached serious proportions at Troutdale and which is gaining momentum at Spokane. While this damage only involves reduction plants, it affects the sale of these other plants, because we should sell only an integrated unit such as is involved in these instances, namely an alumina plant, a reduction plant, and an extrusion or rolling mill which carries the bauxite through to the finished stage. I do not know that this offer will be accepted before I turn over my duties to you. I suspect that it will not. This is not designed in any way to influence your judgment but merely to pass on my thinking in this entire matter.
132. When Mather and Gumbel visited the Mead plant on June 25, 1949, in connection with a tour of the plants in the area, they were shown some indication of plant damage and advised of the fume control studies which Kaiser had been performing.
133. The fume control problem at Mead was mentioned sporadically in the negotiations leading up to the sale to the plaintiff of the three plants. From all the evidence, it appears that this was an item by which the plaintiff’s negotiators sought to obtain a lower sales price.
134. On December 29, 1950, Kaiser announced that it was *714 going to install a fume control system at Mead. Contracts were let for the project during 1951 and the first controls were put in operation on one and a half pot lines at the plant on June 30,1952.
135. At the time the Mead plant was purchased, it had six pot lines. A seventh line began operations in February 1951, and an eighth line was started in July 1952. The portions of the fume control system at Mead which are allocable to the six pot lines on 768 pots present at Mead at the time of the sale cost Kaiser $2,711,258.73. Research cost Kaiser $73,400.99.
136. The Mead fume control system was similar to the one installed at Troutdale. Both operate on the principle of hooding the pots to capture the fumes and directing them to scrubbing towers where the fumes are wetted so that particles would not escape into the atmosphere. However, the Kaiser system was superior in its arrangement of the equipment. Kaiser benefited from the Reynolds experience and eliminated some of the errors which Reynolds had made in its system.
137. The defendant has paid under the indemnity agreement both under the leases and sales contract to Reynolds the sum of $973,251.60. These amounts were paid by Reynolds on account of fume damage claims at Troutdale and reimbursed by the defendant. Further claims by Reynolds on account of judgments entered against it prior to the November 3, 1950 cut off date (date of completion of fume control system) are still pending.
138. Reynolds, while negotiating for the purchase of the plants it bought, had the protection of the provisions of the fume-control indemnity clauses of its leases. Kaiser had no similar provisions in its leases.

Carbon, Electrode Capacity

A. Rehabilitation at Jones Mills

139. The Reynolds’ purchase agreement contained the following provision upon which Kaiser bases this portion of its claim:
*715 (26) Purchaser will receive a credit for the amount Reynolds Metals Company has expended up to Five Hundred Fourteen Thousand Dollars ($514,000.00) in putting potline 2C at the Jones Mills Aluminum Reduction Plant into operating condition less the amount thereof it has deducted from rental due on said potline. It will also receive a credit for the amount it or Reynolds Metals Company will have spent or will spend for putting potline 1C at said plant into operating condition not in excess of Five Hundred Fourteen Thousand Dollars ($514,000.00).
$ $ 3* * $
No like provision is in the Kaiser purchase agreement. Kaiser claims that a comparable provision in the Kaiser agreement would provide for additional carbon electrode baking facilities at the Mead plant.
140. The process of putting the aluminum plants into operating condition at Government expense was followed during the period of leases for all of the plants involved in this case. In the reduction plants this “rehabilitation” consisted in part in the reconditioning of the pot lines. The rehabilitation expenses were not treated as a capital addition to the plants.
141. All of the pot lines at Troutdale and Mead were reconditioned during the lease period at Government expense. At Jones Mills, only two of the four lines were leased by Reynolds in 1946 because power was only available for half of the plant at this time. Accordingly, only 3C and 4C were reconditioned at the time of the original leasing.
142. When Reynolds agreed to lease the remaining two pot lines at Jones Mills, War Assets agreed to put them in operating condition. On January 10,1949, a letter of intent was given to Reynolds providing for the rehabilitation of the two pot lines which had not previously been reconditioned, pot lines 1C and 2C, at Government expense.
143. Work began on pot line 2C on January 13,1949. The project was delayed by a strike from August 1,1949 to September 26,1949. By December 31,1949 the project was 71.23 percent physically complete.
144. Work began on pot line 1C on May 11, 1949, and it too was delayed by the strike. By December 31,1949 this project was 24.03 percent physically complete.
*716 145. During the Reynolds’ purchase negotiations, the Government negotiators readily agreed to complete the reconditioning of the two pot lines at Jones Mills because the lines at the other reduction plants had been rehabilitated at Government expense. In total the reconditioning of pot line 1C cost $396,995.07. Pot line 2C cost $454,727.33.

B. Carbon at Mead,

146. The electrolytic process utilized at Troutdale, Jones Mills, and Mead for the reduction of alumina to aluminum requires the use of carbon electrodes. These electrodes are blocks of carbon which are suspended into the reduction pot. The carbon electrodes are used as the anode, the positive electrode, and the carbon lining of the pot is used as the cathode, the negative electrode. During the reduction process, the oxygen from the alumina combines with the carbon from the electrode to form C02 and the carbon electrodes are gradually consumed.
147. The carbon electrodes are baked in large pit type carbon baking furnaces. The wartime reduction aluminum plants built by Alcoa totaled 36 lines and had 15 carbon baking furnaces. Of these, Jones Mills had four lines and two furnaces. Troutdale had four lines and three furnaces, and Mead had six lines and two furnaces. Each line contained 128 pots. The furnaces were of equal capacity. Jones Mills now has five lines.
148. With two furnaces, Mead did not have sufficient carbon electrode baking capacity for the operation of six lines. On the other hand, Troutdale had an excess of capacity because it had three furnaces for four lines. When Troutdale was leased to Reynolds a provision was included in the lease that the excess carbon produced would be sold to the operator at Mead at cost plus a reasonable profit.
149. On September 12, 1946, Kaiser advised War Assets that with all six lines in operation the Mead plant required 6,000 tons per month of carbon electrodes, that the plant had a capacity of 5,200 tons per month, and that it would need an additional 800 tons per month when the six lines were in operation.
150. The Mead lease contained the following provision:
*717 Twentt-One : During the term of this Lease or any renewal or extension thereof, in the event that the electrode capacity at the leased premises should be determined insufficient to supply the full requirements of the pot lines which Permanente has requested Lessor to place in condition to operate, Lessor will either:
(1) Construct at the leased premises sufficient electrode capacity to meet the deficiency; or
(2) Supply to Permanente from other sources the amount of electrodes necessary to meet such deficiency at such price and upon such terms as may be mutually agreed but in no event at a unit price higher than the equivalent cost of production of electrodes by Perma-nente at the leased premises, including rent, taxes, insurance and overhead. Should Lessor at any time fail so to supply electrodes. Permanente may itself purchase the same at prevailing prices, and may deduct from the rentals otherwise payable hereunder any excess cost of electrodes to it over and above such cost of production at the leased premises.
In the event that the Lessor constructs additional electrode capacity to meet the deficiency in accordance with paragraph (1) of this article, Permanente shall pay additional rent calculated on the full cost of such construction at the rate of 4% the first year after the construction is completed, 5% for the second year, 6% for the third year, 7% for the fourth year, and 8% for the fifth and any succeeding year.
* # # *
During the lease period, no requests were made by Kaiser for additional carbon electrodes under this provision.
151. From time to time in the purchase negotiations, the Kaiser representatives mentioned the elimination of the above carbon obligation in the Mead lease as one of the advantages to the Government of a sale.
152. The sixth line at Mead had not been in operation under the plaintiff’s lease until March 1948. It was able to operate until November of that year when the available electric power from the northwest power pool required a shutdown of one-half a line. Beginning in March 1949, the six plot lines were operating, and this was also true at the time the plaintiff purchased the three plants in July 1949.
153. During the periods when the lines or parts of them were shut down because of the power shortages .which came in *718 the fall and extended into the springtime, the carbon furnaces were constantly operating in order to produce carbon electrodes when needed.
154. Beginning in early 1950, the plaintiff increased the capacity of the Mead plant by extending the pot lines. Sometime prior to 1954 an additional carbon-baking furnace was built by the plaintiff at Mead. It was enlarged in 1954 and again in 1955.

Acquisition Costs

155. There was at no time an agreement between Kaiser and WAA as to the correct amount of acquisition costs of the three plants which the plaintiff purchased. From all of the evidence in this record, it appears that a precise figure is not possible of ascertainment. It is true that in the discussions concerning acquisition costs leading up to the July 27 final negotiation conference, the figure $91,391,199 was referred to by WAA representatives. Up to the minute that Kaiser and Mather settled on the $36,000,000 negotiated figure, however, Calhoun was quarreling with McCormack as to the error of the WAA cost figures.
156. The $91,391,199 total for the Kaiser plants was based upon the final cost figures submitted by Alcoa, as adjusted by the War Assets Appraisal Division to reflect additions or deletions to the facilities. As a matter of practice, the Appraisal Division included the estimated cost of the facilities in its “fair value” valuation report submitted July 8,1949.
157. In order to utilize the acquisition cost basis in the Reynolds’ negotiations, Joss and Holland requested that the Appraisal Division supply them with the costs of the four Reynolds’ plants. On November 10, 1949, Coplan prepared a memorandum showing the adjusted acquisition costs of the Reynolds’ plants under lease as $130,548,249. Coplan recommended that consideration be given to the deletion of the $355,528 cost of the stop-gap fume control at Troutdale and of the costs of putting the fourth pot line at Jones Mills in its original condition.
158. Joss and Holland computed that the $36,000,000 price of the Kaiser plants was 39.39 percent of their estimated acquisition costs of $91,891,199. In the Reynolds’ negotia *719 tions, it was agreed that the cost of the stop-gap fume control, $855,528, be eliminated and the estimated cost of the permanent fume control system which was being installed be treated as a capital addition. It was also agreed that the sinter plant at Hurricane Creek would be treated separately. Ultimately, the Reynolds’ purchase price was reached in the following manner:
Cost of all facilities (estimated by Appraisal Division)-$130,192,731
Estimated Cost of Fume Control, Troutdale- 2,150,000
Total Estimated Cost- 132,342,731
Less Estimated Cost Sinter Plant at Hurricane Creek-._ 9,452, 528
Amount computed at 39.39 percent of estimated cost_ 122, 890,203
Facilities less Sinter Plant 39.39 percent of $122,890,203_ 48,406,451
Sinter Plant — 17.7255 percent of $9,452,528_ 1,675,507
Total Firm Price_ 50,081,958
159. It is to be noted that there was a sinter plant at Baton Rouge which the plaintiff neither leased nor purchased. This was so because it did not, and did not expect to, treat low grade domestic ores at this plant. The sinter plant had been constructed at a time during the war when shipment of foreign ores was threatened by the menace of enemy submarines.
160. By the middle of November 1949, McCormack was no longer employed at WAA. Benjamin J. Coplan, industrial engineer, was given the task of furnishing information concerning cost to Joss and Holland who were the defendant’s chief negotiators with Reynolds. On June 15,1950, Coplan prepared the valuation report in evidence as defendant’s exhibit 2 which carefully analyzed the basis upon which the sale of the four plants to Reynolds had been accomplished in December of 1949. That report reads in part as follows:

*720
Basis of sale to Reynolds Aluminum Company

In making a disposal of these plants to Reynolds the Liquidator was faced with the problem of keeping the sale on the same basis as the sale of similar plants to Permanente Metals Corporation. Reference to the Per-manente sale indicated that sale was made at 80% of basic fair value of the plants computed on the basis of 20 year firm leases offered to Permanente or approximately 89.39% of the estimated net cost of the facilities. Assuming identical conditions between the Permanente and Reynolds plants, either method would produce prices fairly close to each other, and no doubt keep a sale to Reynolds on substantially the same basis as the sale to Permanente. The Liquidator determined that the percentage of cost basis was the more desirable of the two methods of computing the sales price. This method was followed and the same percentage of cost as that resulting from the Permanente sale was applied to estimated net cost of the Reynolds plancors, except for the Sinter plant portion of Plancor 226-X which was computed at a lower rate as hereinafter explained.
Reynolds Metals Company during the negotiation period submitted to the Liquidator or discussed various data to show certain economic disadvantages of its leased plants, for the purpose of having the sales price reduced to conform to its offer. One of Reynolds’ computations assumed a selling price for each of the plants sold to Permanente and derived therefrom a purchase price per unit of capacity. It then applied this price per unit of capacity to the estimated capacities of each of its similar leased plants from which it obtained the suggested sum of $45,178,120 as a fair purchase price. It was the opinion in the Appraisal Division that this basis of price computation was erroneous because it did not give full consideration to Reynolds’ lease commitments nor to the physical assets of its leased plants; in short, while the Permanente and Reynolds plants are similar in function, they are not identical, and Reynolds’ analysis results in a comparison of values on an imlike basis. This opinion was furnished to the Liquidator in Appraisal Division memorandum dated October 25, 1949.
Reynolds Metals Company submitted further data intended to show an overall disadvantage in freight charges involved in shipment of aluminum from its leased reduction plants to its fabricating plants as compared with Permanente’s cost in shippmg aluminum *721 from the reduction plant at Mead, Washington to its principal fabricating plant at nearby Trentwood, Washington. Reynolds later also brought into its arguments the higher cost of power at Plancor 226-K, Jones Mills, Ark., as compared with power cost for aluminum reduction plants in the Northwest, and the possibility of the economic life of Plancor 22'6-X, Hurricane Creek, Ark., as a whole, being severely limited by the availability of low-grade bauxite. Particular reference was made to the Sinter plant portion of Plancor 226-X. This portion of the Plancor is useful solely in the processing of the low-grade bauxites and would have no processing value, for example, once it becomes necessary to import better grades of bauxite or use better grades of local bauxite if available. Reynolds stated in effect that it would buy the leased plancors at the percentage of cost derived from the Permanente sale if the cost of the power generating plant portion of Plancor 226-K, Jones Mills, was eliminated from the cost base, and if the percentage to be applied to the cost of the Sin-ter Plant portion of Plancor 226-X was determined by the period of time it might have value to Reynolds.
A study of Reynolds’ various contentions concerning the economic disadvantages of its plants leased would be lengthy, complicated, and would require detailed data of Reynolds’, Permanente’s, and Alcoa’s operating costs to approach a conclusive answer. Studies made in War Assets in the limited time and with the limited data available, however, indicated Reynolds with its leased plants would be at no overall competitive disadvantage with Permanente and possibly not with Alcoa as long as the average cost of power permitted operation of four pot lines at Plancor 226-K, and as long as there is available a sufficient supply of local bauxite at reasonable cost to permit operation of Plancor 226-K. This conclusion was reached mainly because of the relatively low cost of producing alumina at Plancor 226-X from local bauxite, and the proximity to this alumina plant of Plancor 226-K where about 32% of Reynolds’ aluminum may be produced with nominal shipping costs for alumina.
The basic fair value for the Reynolds plants, as was the case for the Permanente plants, resulted from capitalized estimated rental expectancy on long term leases and estimated value of residual plant at the end of the leases, with adjustment to bring cost of occupancy under ownership in line with cost of occupancy under lease. There was no place in such a calculation for evaluation, *722 or attempted evaluation, of such matters as the greater original cost at Plancor 226-X for over-capacity as compared to the Permanente alumina plant at Baton Rouge, the fact that no Sinter Plant was included in the sale of Baton Rouge while a Sinter Plant was included in Plan-cor 226-X, and the fact that once local bauxite for the Plancor is exhausted Reynolds would have no further need for the Sinter Plant, but would have the substantial additional cost of transporting imported bauxite by rail from Gulf ports to Hurricane Creek. The latter factor is absent with respect to Permanente’s alumina plant at Baton Rouge. Because its purpose was to produce a fair value as nearly comparable as possible to that on which the Permanente plants were sold without consideration of such factors, the Appraisal Division did not attempt to introduce in its original computations complicating factors such as the effect on value of the relatively early exhaustion of bauxite suitable for processing in the Sin-ter Plant. It is reasonable to assume, however, that if Reynolds had continued under the lease and a situation arose making the use of the Sinter Plant impracticable, then Government officials servicing the lease would consider an equitable modification of the lease terms on Plan-cor 226-X. In view of such a possibility, and the added responsibility of attempting insofar as this sale goes to keep Reynolds in a competitive position over the long term, it was necessary and proper for the Liquidator to consider an adjustment of the sales price formula on Plancor 226-X with respect to the contingency of non-use of the Sinter Plant portion and uneconomic use of the plant as a whole.
# # # ift

Ultimate Finding

161. With the single and substantial exception of the plaintiff’s claim for backdating, it has not been shown that the sale by War Assets Administration, General Services Administration, to Reynolds of the four plants it purchased was a more favorable disposal than the sale to the plaintiff of the three plants it purchased was to the plaintiff.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and it is therefore *723 adjudged and ordered that plaintiff recover of and from the United States the sum of five hundred eighty-three thousand five hundred forty-nine dollars ($583,549.00).

 until November 28, 1949, the same corporation was named tbe Permanente Metals Corporation.

 See finding 21.

 Finding 57.

 See finding 83.

 See finding 135 for tlie cost to Kaiser of fume controls at Mead.

 Finding 108.

 Finding 111.

 Finding 112.

 Rinding 110.

 Finding 126.

 See findings 150 and 151.

 See finding 60.

 See finding 78.

 See finding 103. The plaintiff has suggested two damage theories on this point. We think fairness requires that the damage figure, against which interest is to be offset, should be the difference between the Reynolds’ rent canceled and the Kaiser’s rent canceled, or $1,672,285.30.

 See findings 98, 99, 100, and 101.

 See p. £» of tMa opinion.

 U.S. v. Aluminum Co. of America, 148 F. 2d 416.

 Not in evidence.

 See finding 94.